**MONTGOMERY WARD & CO., INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 88–2165, 88–2471.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1990.

Decided June 13, 1990.

Alexandra M. Goddard, Montgomery Ward & Co., Chicago, Ill., Patrick M. Flynn, Watson, Flynn & Bensik, Houston, Tex., for Montgomery Ward & Co.

Aileen A. Armstrong, Appellate Court-Enforcement Litigation, John C. Truesdale, John D. Burgoyne, Appellate Court, Enforcement Litigation, Washington, D.C., Michael M. Dunn, Houston, Tex., Guadalupe Ruiz, San Antonio, Tex., Lois Johnson, James R. Watson, Jr., Bray & Watson, Houston, Tex., Harry R. Poole, Samuel J. Talarico, George R. Murphy, Steven B. Goldstein, Elliott Moore, Susan L. Williams, Appellate Court-Enforcement Litigation, Washington, D.C., Louis V. Baldovin, Jr., Houston, Tex., for National Labor Relations Board.

Before FLAUM, EASTERBROOK and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

The issue presented in this appeal is whether the National Labor Relations Board abused its discretion in ordering the imposition of a bargaining order as the appropriate remedy for a string of unfair labor practice violations by the petitioner during a certification election although almost eight years had passed and circumstances had materially changed since the violations occurred. We decline to enforce the Board's imposition of a bargaining order and remand the case for further consideration concerning the appropriateness of traditional remedies in light of substantial changes occurring in the intervening years affecting management and the work force.

## I.

This matter is before us on the petition of Montgomery Ward & Co., Inc. (the "Company" or "MW") for review of an order by the Board, and on cross-application of the Board for enforcement of that order.[1] The underlying facts of this case are uncontested. The Company operates a retail store and warehouse in Pharr, Texas. In January of 1980, union organizational activity began among the employees of the store and warehouse. The United Food and Commercial Worker's International Union, Local Number 455 (the "Union"), responded to inquiries by the employees. Employees who supported the Union solicited signed authorization cards from fellow employees. After the organizational campaign, the Union notified MW by letter that it represented a substantial majority of the employees in the Pharr store. The Union also filed a Petition for Certification of Representation. On June 18, 1980, an election was held and the employees voted 132 to 121 against representation by the Union, with 8 challenged votes.

Beginning on April 1, 1980, the Union filed a series of charges against MW alleging various violations of sections 8(a)(1), (3), (4) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the "Act"). The Regional Director issued a complaint in response to each of the charges. The ALJ issued his opinion on March 10, 1982, almost two full years after the charges were filed. In his thorough and extensive 135 page decision, the ALJ found that the Company engaged in an active campaign to defeat the union organizing drive and in doing so committed a myriad of serious and far-reaching unfair labor practices in flagrant violation of the Act. The ALJ also found that on April 24, 1980, the Union represented a majority of the employees and that by not recognizing the Union, MW violated section 8(a)(5). The most serious violations by the Company included findings that supervisors responded to union activity with surveillance, interrogation, threats of violence and loss of work hours, and discharge of union leaders, unlawful conduct by the highest-ranking officials at the store, and a program of grievance solicitation and wage increases. The ALJ concluded that based on the number and severity of the violations, "the imposition of a bargaining order was warranted...."

1. The Decision and Order of the Board is reported at 288 NLRB No. 20 (1988).

On April 26, *1982*, both MW and the General Counsel filed exceptions to the ALJ's decision. The case was transferred to the Board and its Decision and Order was issued on March 24, *1988, some five years and eleven months later*. In total, the decision was rendered almost eight full years after the certification election. The Board, however, made no mention of this passage of time and offered no explanation for its delay. In its decision, the Board affirmed the ALJ except to reverse the ALJ's findings regarding four violations of section 8(a)(1) by several supervisors. The Board ordered broad remedial relief including the imposition of a bargaining order on the grounds that the unfair labor practices made " 'the possibility of erasing the effects of past practice and of ensuring a fair election (or a fair rerun) by the use of traditional remedies though present, is slight and that employee sentiment once expressed through cards, would, on balance, be better protected by a bargaining order.' " (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614–15, 89 S.Ct. 1918, 1940–41, 23 L.Ed.2d 547 (1969)).

MW then filed a motion requesting the Board to reopen the record for rehearing and reconsideration. The basis for MW's motion was that the imposition of the bargaining order was unwarranted because much had changed during the eight full years that had passed since the time the union organizational activity began and the Board's order, and thus, more traditional remedies were adequate to ensure a fair election. In support of its motion, MW offered evidence that during that time 82.4% of the work force at the Pharr store had turned over, only one of the thirteen supervisors who were alleged to have committed unfair labor practices was still employed at the store, and the Company had no prior history of anti-union animus. The Union and the General Counsel opposed the Company's motion, arguing that denial of a bargaining order would reward rather than deter unfair labor practices.

In a brief two page opinion the Board denied the Company's motion finding that "passage of time is not a sufficient basis for denying a bargaining order." The Board also found that "even assuming the accuracy of the evidence the [Company] now seeks to adduce, that evidence does not demonstrate that a bargaining order is inappropriate." The Board concluded that "because of the nature of the unfair labor practices which we have found affected the entire bargaining unit and tended to have a lingering effect, we conclude that the possibility of ensuring a fair election by traditional means is slight and that employee sentiment reflected through authorization cards is best protected by a bargaining order." MW now appeals the Board's imposition of the bargaining order in light of the passage of time and change in circumstances.[2]

## II.

Under Section 10(c) of the Act, 29 U.S.C. § 160(c), the Board is charged with "the task of devising remedies to effectuate the policies of the Act." *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953). In *NLRB v. Gissel*, 395 U.S. 575, 610–16, 89 S.Ct. 1918, 1938–41, 23 L.Ed.2d 547 (1969), the Supreme Court upheld the Board's authority to order the employer to bargain with a union where the employer has committed unfair labor practices that "have a tendency to undermine majority strength and impede the election process." *Id.* at 614, 89 S.Ct. at 1940. The Board can impose a bargaining order where it "finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order ..." *Id.*

In its initial decision, the Board reviewed the serious nature of the unfair labor practices by the Company and found that the

---

**2.** The Company does not contest the Board's findings that it in fact violated numerous sections of the Act. Its sole claim on appeal con- cerns the appropriate remedy to redress those violations.

Company's actions had a "lingering" and "pervasive" effect that " 'once conjured up, [are] not easily interred.' " (citation omitted). The Board then arrived at its holding that the imposition of a bargaining order was appropriate by perfunctorily determining that traditional remedies could not afford the employees relief from the Company's past unfair labor practices. In its denial of the Company's motion to reconsider, the Board accepted MW's proffered evidence concerning passage of time and change in circumstances as true but nevertheless mechanically concluded that the use of traditional remedies would be inadequate to ensure a fair election and that a bargaining order was the proper remedy.

"Once the Board has spelled out the basis for its issuance of a bargaining order, this [C]ourt's review is limited to whether the Board abused its discretion." *Justak Bros. v. NLRB*, 664 F.2d 1074, 1081 (7th Cir.1981). While the Board's power in fashioning remedies is a broad discretionary one, we have held that bargaining orders, due to their "drastic consequence of forcing union representation on employees and forcing the employer to bargain, are not the favored remedy." *Id.* Thus, "[t]o grant a bargaining order in any instance other than in the last resort (when other traditional remedies are available) constitutes an abuse of the Board's discretion." *Impact Industries, Inc. v. NLRB*, 847 F.2d 379, 383 (7th Cir.1988). Accordingly, we have required the Board to "give specific reasons that justify its use of the bargaining order remedy," *Id.; Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118 (7th Cir.1973). In the absence of an "express articulated consideration of the propriety of a bargaining order this court will presume that an election is the preferred means for determining representative status." *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 694 (7th Cir.1982). Most importantly for our purposes, we held

in *Peerless of America*, that the Board must make:

"[s]pecific findings" as to the immediate and residual impact of unfair labor practices on the election process ... and *a detailed analysis assessing the possibility of holding a fair election* in terms of any continuing effect of misconduct ... *and the potential effect of ordinary remedies.*

484 F.2d 1108, 1118 (7th Cir.1973) (emphasis added).

In the instant case, the Board met its initial burden by adequately documenting and discussing the number and severity of the unfair labor practices along with the residual effect of these violations on the bargaining unit. We do not question these findings but conclude nonetheless that we must deny enforcement of the Board's order and remand for further consideration on the grounds that the Board failed to "articulate specifically the inadequacy of traditional remedies." *Impact Industries*, 847 F.2d at 383; *Berger*, 678 F.2d at 695. Here, the Board merely found that, as a general matter, the seriousness of the unfair labor practices necessitated a bargaining order but in reaching this conclusion it did not articulate the reasons that traditional remedies would be inadequate to ensure a fair election. As in *Impact Industries*, "the problem in this case is not that the Board failed to articulate a reason for the bargaining order but rather that the Board failed to consider all the relevant evidence concerning the availability of other, more traditional remedies before issuing a broad bargaining order." *Impact Industries*, 847 F.2d at 383.[3] We find, therefore, that it was an abuse of discretion for the Board to impose a bargaining order without sufficient analysis and discussion of the adequacy of traditional remedies. We cannot accept the Board's summary conclusion as sufficient to support the imposition of a bargaining order under the circumstances present in this case.

3. We note one significant distinction between our case and *Impact Industries*. In *Impact Industries* the Board "failed to consider all the relevant evidence concerning the availability of other, more traditional remedies before issuing a broad bargaining order." 847 F.2d at 383. Here, the Board considered the evidence but then mechanically stated, without further analysis or discussion, that traditional remedies would be inadequate.

The Board is free on remand to select what it considers to be the appropriate remedy, including the re-imposition of a bargaining order if traditional remedies are deemed to be inadequate. We note, however, that the evidence offered by the Company in its motion to reconsider concerning the passage of time and the change in circumstances at the store should be directly relevant to the adequacy of traditional remedies. In its denial of MW's motion to reconsider, the Board accepted as true MW's proffered evidence that in the eight years between the election and the Board's order over 80% of the work force had turned over and only one of 13 managers remained, but concluded nonetheless that traditional remedies would be inadequate. As we noted under similar facts in *Impact Industries,* "[t]his passage of time, coupled with the change in circumstances at the plant, would seemingly present a strong case in support of [the company's] argument that a second representation election should be conducted to permit the new work force at Impact to determine whether it wants to bargain with the [employer]." *Id.* at 383. The evidence presented by MW is "particularly relevant in determining whether, other, more traditional remedies might be an effective means of rectifying" MW's past sins. *Id.* at 383.[4] On remand, the parties should be free to submit evidence regarding the passage of time and change in circumstances and its effect on the bargaining unit and the "lingering" and "pervasive" nature of the unfair labor practices.

As a final matter, we feel compelled to express our concern over the amount of time it took for the Board to render its initial opinion in this case. Neither party was able to explain why the Board required almost six full years to render its sixteen page opinion, which in effect affirmed a great majority of the ALJ's findings. The Board offered no explanation for its delay

and none is readily obvious from the circumstances of this case. Our recent case law reveals that this is not an isolated incident—delay is becoming the rule rather than the exception with the Board. Such delay undermines the efficacy of the administrative process and ill-serves the parties. The Board has managed to place its own capacity at issue in this case, forcing the parties and the Court to search for the appropriate remedy for violations which occurred over a *decade* ago. Lengthy delay also serves to further insulate the administrative agency from effective judicial review. Our standard of review is highly deferential and one could question the sensibility of affording such deference when an agency is unable to perform its statutory duty in a more expedient manner. The interests of justice can best be served when the Board exercises its mandate more promptly than it did in this case.

### III.

Accordingly, we REMAND the case for the Board to consider, in detail, whether in light of the passage of time and change in circumstances the use of traditional remedies would be adequate to ensure a fair election.

EASTERBROOK, Circuit Judge, concurring.

I agree with Judge Flaum that the case must be remanded to the Board, and I join his opinion except to the extent it implies that the Board may justify a bargaining order after a decade's delay by incanting the traditional formulas. Although the Board is entitled to a chance to focus on this issue, coming up with an explanation adequate to support a bargaining order will be a tall order.

A bargaining order is reserved for unusual cases, *NLRB v. Gissel Packing Co.,*

---

**4.** After we remanded to the Board in *Impact Industries,* the Board withdrew the bargaining order and ordered a second election. The Board found "that the impact of the Respondent's unfair labor practices has been mitigated to the extent that their likely effects can be erased through traditional remedies." The Board concluded that "changed circumstances have substantially dispelled the effects of the unfair labor practices, we further find that our traditional remedies are sufficient to permit the exercise of free choice in a rerun election." *See* 293 NLRB No. 99 (1989).

395 U.S. 575, 610–15, 89 S.Ct. 1918, 1938–41, 23 L.Ed.2d 547 (1969), not because courts ought to save employers from the deserts of their illegal behavior but because § 7 of the NLRA provides that employees' choice of bargaining representative or no representative is conclusive. A bargaining order may thwart the current employees' preferences. Although the people who work at the Pharr store in 1990 might want Local 455 of the Food Workers Union to represent them, we don't know this. They might want some other union, or no union. Local 455 might not want *them* (a possibility suggested by its failure to intervene in support of the Board's order or file an *amicus* brief). A bargaining order today based on events a decade ago may defeat all contemporary interests.

Such a step may be justified if achievement of today's desires will be frustrated *no matter what*—by a bargaining order if the employees don't want a union, or by inability to exercise free choice if they do. If the unfair labor practices would prevent a reliable election even today, or if the employer is likely to spoil a new election and again frustrate free choice, and if the card majority remains the best information about employees' preferences, then a bargaining order makes the best of an impossible situation.

Passage of time, and removal of the persons within the firm responsible for the violation, affect these things. At oral argument counsel for the Board conceded that had Local 455 been put in place in 1982, immediately after the administrative law judge's order, it could have been voted out in 1983 after the one-year bar. What the Board has never explained—in this case or any other—is how the passage of a single year with the union "in" means that the employees' later votes represent free choice, while the passage of a much greater period with the union "out" has no such effect. Maybe the presence of a union assures the employees that they are safe in collective action; maybe not. Suppose a union had been recognized at Pharr in 1982 and that Montgomery Ward had refused to sign a collective bargaining agreement (as it would be entitled to do, after good-faith bargaining). By 1983 all the employees would have learned is the futility of joint action, yet the Board would allow the union to be voted out. Inconsistencies of this kind require explanation, which has never been supplied.

Even more fundamental is the question: "When *are* employees unable to express free choice in an election?" At the time of *Gissel* the Board was of opinion that employees are so timorous that only "laboratory conditions" would allow them to exercise free choice. *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962); *Gummed Products Co.*, 112 N.L.R.B. 1092 (1955). The NLRB had an (implicit) picture of an employee whose decision to sign an authorization card under the watchful stare of a union organizer presumptively represents free choice, yet so befuddled by propaganda that even in the secrecy of the voting booth he would be too scared or baffled to vote freely. If employees are indeed such wee, tim'rous beasties, then elections are pointless and the Board should be deciding for employees, as it does when it issues a bargaining order.

Since *Gissel* the Board has abandoned this view of employees in light of research disclosing that (a) electioneering does not have much effect (most employees' minds are made up before the campaign); (b) unfair labor practices during the campaign, far from causing the employees to vote against the union, cause them to appreciate that they *need* a union, and consequently improve the union's chance of winning in a secret ballot. Julius G. Getman, Stephen B. Goldberg & Jeanne B. Herman, *Union Representation Elections: Law and Reality* (1976). In *Shopping Kart Food Market, Inc.*, 228 N.L.R.B. 1311 (1977), the Board, citing this research, threw over its old "laboratory conditions" doctrine and adopted a view that only fraud or egregious practices spoil a vote. *Shopping Kart* was overruled in *General Knit of California, Inc.*, 239 N.L.R.B. 619 (1978), which was overruled in turn by *Midland National Life Insurance Co.*, 263 N.L.R.B. 127 (1982). Prevailing doctrine has it that employees are rather hardy, so that the

results of elections usually stand despite imperfections that would have led to reruns or bargaining orders in earlier years.

All the more curious, given this revision of the rules for when the Board throws out the results of an election, that the Board has never changed its view that once an election is thrown out, a bargaining order is appropriate because employees are easily confused and dissuaded from supporting the union. The Board has two models of employee: one that it uses when deciding when to accept the results of an election, and another that it uses when deciding whether a new election would give effect to the employees' preferences. It has never explained this disparity, despite being criticized for it. *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1369–73 (7th Cir.1983) (collecting critics); Note, *The* Gissel *Bargaining Order, the NLRB, and the Courts of Appeals: Should the Supreme Court Take a Second Look?*, 32 S.C. L.Rev. 399 (1980).

This convenient inconsistency may be responsible for the increasing unwillingness of courts to defer to the Board's say-so that a new election could not be effective. Our opinion in *Impact Industries, Inc. v. NLRB*, 847 F.2d 379 (7th Cir.1988), threw a case back to the Board, which decided that a bargaining order wasn't necessary after all, 293 N.L.R.B. No. 99 (1989). Other opinions stopped the contest without a remand. *Village IX*, one of the no-remand group, pointedly remarks on the Board's inability or unwillingness to explain why it issues bargaining orders, an inability that may be attributable to its inconsistent assumptions about employees' psyches. See also, e.g., *First Lakewood Associates v. NLRB*, 582 F.2d 416 (7th Cir.1978); *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108 (7th Cir.1973). Decisions from other circuits include *NLRB v. Knogo Corp.*, 727 F.2d 55, 60–61 (2d Cir.1984) (serious unfair labor practices; no enforcement given 4 year delay and 60% turnover); *NLRB v. Pace Oldsmobile, Inc.*, 739 F.2d 108 (2d Cir.1984) (serious unfair labor practices; no enforcement given 4½ year delay and 50% turnover); *NLRB v. Jamaica Towing Co.*, 632 F.2d 208, 216 (2d Cir.1980) (moderate unfair labor practices; no enforcement giv-

en 5 year delay and 38% turnover); *NLRB v. Apple Tree Chevrolet, Inc.*, 671 F.2d 838, 841–42 (4th Cir.1982) (moderate violations; no enforcement given 4½ year delay and 75% turnover); *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 120 (1st Cir.1978) (moderate violations; no enforcement given 3 year delay and turnover among labor and management). There are many similar cases. Individually and collectively, they have done nothing to induce the Board to give reasons or reconcile its approaches.

In exercising its *Gissel* power, the Board ought to do what a district judge does when issuing an injunction: determine what remedy is necessary as of the time the order issues, taking into account both the likelihood of error and the costs of false positives and false negatives. *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593–94 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433–34 (7th Cir.1986). A reasoned decision holds to a minimum the sum of these error costs. So far the Board has not done this (thus we can't enforce its order). It is hard to see how the Board *could* conclude that the bargaining order is likely to produce the least costs. Our case is at the far end of the scale, with a decade's delay, 85% turnover among employees and 95% turnover among managers. The chance that what happened 10 years ago would prevent a new group of employees from holding a good election today is vanishingly small. So even if an error in thinking that a new election could yield a valid choice is a graver mistake than an error in believing that the "real" choice in 1980 was the union, a new election here yields the least net costs of error. I can't imagine how the Board could justify a bargaining order unless it is prepared to overrule *Midland* and restore the old "laboratory conditions" view of employees as ninnies.

Especially not given the ratio of cards to votes. According to the Getman study (the basis of the Board's decision in *Shopping Kart*), on average 18% of those who sign authorization cards do not want the union. They sign because they want to mollify

their friends who are soliciting, because they think the cards will get them dues waivers in the event the union should prevail, and so on. On average, then, we expect to see—and do see—substantial slippage between the cards and the votes in a simon-pure election. When unions get between 50% and 70% of the cards, they win only 48% of the elections. See *Village IX*, 723 F.2d at 1371.

Local 455 collected 145 authorization cards at Pharr out of 283 employees, or 51.2%. When election day came, 270 employees were eligible to vote. The union got 121 votes, the employer 132; there were 8 challenged ballots. So the union's support shrank from 51.2% of card signers to 47.8% of the votes (excluding the 8 contested ballots). Measured as a ratio of votes to cards it comes out at .834, a shrinkage of 16.6%, less slippage than is expected in the normal campaign. Far from demonstrating that the employer's practices should be expected to have an irreparable effect 10 years later, this ordinary drop suggests that there was insufficient reason to set the election aside in the first place—for, as usual, employees are hardier than the Board lets on.

No other case of which I am aware ended in a bargaining order after a paltry decline between the card majority and the election. Combine that with a 10 year delay, 85% turnover among employees, and 95% turnover among managers, and it is hard to see what the Board could say on remand, short of a wholesale reexamination of its assumptions. All that could be left is a desire to punish the employer, and "to give the employees a collective bargaining representative that they do not want, as a way of punishing their employer for committing unfair labor practices, is so discordant with the basic philosophy of the Act" that it should not be done. *Village IX*, 723 F.2d at 1370. See also *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 444 (D.C. Cir.1972).

RIPPLE, Circuit Judge, dissenting.

I would enforce the bargaining order imposed in this case. Montgomery Ward concedes that it committed serious violations of the National Labor Relations Act but contends that a bargaining order is unnecessary to remedy those unfair labor practices given worker turnover and the passage of time. It is clear from the Board's decision and its order denying the company's motion to reopen the record that the Board sufficiently examined the facts involved in this case, including the time and turnover issues. Accordingly, I am not persuaded that the Board ought to be required to reconsider the appropriateness of a bargaining order in light of these changed circumstances.

A.

The standard of review applicable to this case is familiar and not in dispute. Congress has charged the Board with "the task of devising remedies to effectuate the policies of the Act." *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953); *see* 29 U.S.C. § 160(c). Thus, " 'it is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged.' " *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944) (quoting *International Ass'n of Machinists v. NLRB*, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940)). The Board makes these determinations "based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969).

In *Gissel, id.* at 610–16, 89 S.Ct. at 1938–41, the Court concluded that the effect of such unlawful conduct may be expunged by a bargaining order "where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely," *id.* at 610, 89 S.Ct. at 1938. When examining whether a bargaining order is appropriate, "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *Id.* at 612 n. 32, 89

S.Ct. at 1939 n. 32. "Once the Board has spelled out the basis for its issuance of a bargaining order, this court's review is limited to whether the Board abused its discretion," for "the appropriateness of a bargaining order is, like all remedies, entrusted to the sound discretion of the Board." *Justak Bros. and Co. v. NLRB,* 664 F.2d 1074, 1081–82 (7th Cir.1981).

### B.

Changes in circumstances within a company are certainly relevant to the Board's analysis in fashioning remedies to correct violations of the Act. In this case, the Board explicitly recognized that a good deal of time had passed and determined that "[t]he passage of time since the unfair labor practices occurred, though regrettable, is not a sufficient basis for denying a bargaining order." Decision & Order at 12 n. 27.[1] Balanced against the litany of violations committed by Montgomery Ward,[2] the Board concluded that a bargaining order was necessary to remedy the company's unlawful conduct. *Id.* at 11–13. In denying the company's motion to reopen the record, the Board again considered the issue and reiterated that the "passage of time is not a sufficient basis for denying a bargaining order." Order Denying Motion at 2. Moreover, the Board addressed the company's complaint regarding the composition of the work force.[3] Without reopening the record to admit the evidence proffered by Montgomery Ward, the Board assumed the accuracy of such evidence and determined that it

> does not demonstrate that a bargaining order is inappropriate. Notwithstanding turnover in the Respondent's workforce and management, we maintain, for the reasons set out in our Decision and Or-

1. Indeed, we recently enforced a bargaining order issued nearly seven years after the labor violations had occurred. *See May Dept. Stores Co. v. NLRB,* 897 F.2d 221, 223–25 (7th Cir.1990) (merger election took place in August, 1981 and bargaining order was issued in June, 1988). Although the precise issue of passage of time apparently was not before the court and the delay was not caused by the Board's inactivity, the time gap found fatal to enforcement of the Board's order by the majority in this case did not preclude enforcement in *May Department Stores.*

2. In considering the proper remedial order, the Board stated:

> With respect to the appropriateness of a bargaining order, a number of factors lead us to conclude that the Respondent's unfair labor practices "have the tendency to undermine majority strength and impede the election processes" and, consequently, require a bargaining order remedy.
> First, the Respondent engaged in a significant number of incidents of surveillance and interrogation. These incidents involved both individual employees and groups of employees and were so numerous that their effects extended beyond the employees directly involved. Second, the Respondent threatened employees with loss of work hours that, like similar threats of job loss and plant closing, "once conjured up [are] not easily interred." Third, the highest-ranking officials at the Respondent's store engaged in the unlawful conduct, thereby implying the threats represented overall company policy and causing employees to regard them most seriously. Fourth,

the Respondent unlawfully discharged employees Javier Del Castillo and Mary Guerra, the former being the leading activist in the organizing effort. Termination of the leading union adherent necessarily has a lasting effect on other employees and serves as an example of the retaliation that can result from union activity. Finally, the Respondent initiated a pervasive program of grievance solicitation and wage increases. The former, effected by means of an opinion survey and related meetings, had an impact on each individual in the unit. The latter involved the granting of 210 wage increases in the unit of approximately 280 employees. The solicitation of grievances and promises to remedy them, and the grant of wage increases, have a strong coercive effect on employee freedom of choice because they eliminate primary reasons for organization. Moreover, as the increases regularly appear in paychecks, they are a continuing reminder that "the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."

Decision & Order at 11–12 (footnotes omitted).

3. Montgomery Ward also argues that a bargaining order is inappropriate because there is no evidence of prior or subsequent union animus. Assuming that this claim is accurate, as the Board did, the company has not asserted, much less produced evidence, that union organization attempts or pro-union activity of any kind took place in its Pharr, Texas store before or since 1980. Absent such proof, the fact that the company has not demonstrated anti-union sentiment is virtually meaningless.

der, that a bargaining order is warranted in the circumstances of this case.

*Id.*[4] Thus, although the unfair labor practices had occurred eight years earlier and the Board accepted that many of the employees exposed to and the management which engaged in the unlawful conduct are no longer associated with the company, the Board concluded that a bargaining order was required.

### C.

Recognizing the deference owed to the Board's conclusions, issuance of a bargaining order in this case did not constitute an abuse of the Board's discretion. First, we have noted that "[e]mployee turnover should not be a controlling factor," because "an employer could engage in a scheme of unfair labor practices and yet escape a bargaining order by delaying and waiting for employee turnover. We cannot allow this perversion of the Act's purpose." *Justak Bros.*, 664 F.2d at 1082 (citations omitted).[5] An employer who destroys the possibility of a fair election after learning that a union has gained majority support should not be permitted to benefit from the vagaries of the administrative process.[6]

Moreover, with regard to the passage of time, the Supreme Court has concluded that "[i]nordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b) [which limits the Board's authority to remedy unfair labor practices committed more than six months prior to the filing of the charge]." *NLRB v. Katz*, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114 n. 16, 8 L.Ed.2d 230 (1962). In *Katz*, the Board issued a bargaining order more than three years after the first in a series of unfair labor practices had occurred. *See NLRB v. Katz*, 289 F.2d 700, 701 (2d Cir.1961). The Second Circuit refused to enforce the order, but the Supreme Court reversed. 369 U.S. at 748, 82 S.Ct. at 1114. Although not a major issue in the case, the employer maintained that imposition of a bargaining order was improper in light of the passage of time between the company's violations of the Act and the Board's final decision and order. *Id.* at 748 n. 16, 82 S.Ct. at 1114 n. 16. The Court concluded that "[t]he argument has no merit." *Id.* Similarly, in this case, the passage of time does not prevent enforcement of the bargaining order. The Board did not abuse its broad discretion in determining that Montgomery Ward's unlawful conduct continues to affect today's employees. *See* Decision & Order at 11–13.

### D.

The majority is dissatisfied with the degree to which the Board " 'spelled out the basis for its issuance of a bargaining order,' " slip op. at 1159 (quoting *Justak Bros.*, 664 F.2d at 1082), and believes that the Board failed to analyze properly the adequacy of traditional remedies, *id.* at 1160. However, I am convinced that the Board sufficiently articulated its rationale. *See, e.g., Impact Indus., Inc. v. NLRB*, 847 F.2d 379, 382 (7th Cir.1988); *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 694 (7th Cir.1982); *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118–19 (7th Cir.1973). The Board enumerated the company's unlawful conduct, *see supra* note 2, and determined that the nature of these

---

**4.** With regard to the "circumstances of the case," *see supra* note 2.

**5.** *See also Amazing Stores, Inc. v. NLRB*, 887 F.2d 328, 330 (D.C.Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990), where a bargaining order was enforced even though there was an almost complete turnover of personnel within the bargaining unit. The court noted that "[w]here the Board finds that a practice is particularly pervasive or enduring, it need make only minimal findings that the effects have not been dissipated by subsequent employee turnover." *Id.* at 331.

**6.** This is not to say that a bargaining order could be enforced in all instances where there has been delay between the unfair labor practices and the Board's decision and order. *See, e.g., Impact Indus., Inc.*, 293 NLRB No. 99 (1989). However, in cases like this one, where the Board concludes that the circumstances that changed during that delay do not sufficiently dissipate the effects of the employer's unlawful conduct, a bargaining order may be enforced.

unfair labor practices "affected the entire bargaining unit and tended to have a lingering effect" such that "the possibility of ensuring a fair election by traditional means is slight." Order Denying Motion at 2; *see* Decision & Order at 11–12. The unspoken but inescapable result that flows from that conclusion is that a bargaining order is necessary because traditional remedies will not ameliorate the effects of the company's unfair labor practices. Thus, even given the passage of time and high employee/management turnover, the Board properly could find that the effects of the company's repeated and significant violations of the Act so undermined the unionization process that the employees, who expressed their desire to unionize via authorization cards, are best protected by a bargaining order. The Board's analysis satisfies the standard set forth in *Peerless* and its progeny.

Based on our decision in *Impact Industries,* the majority concludes that the Board must reevaluate its determination that a bargaining order is necessary. Slip op. at 1159–1160. I must respectfully disagree with the majority's reliance on and interpretation of that case. In *Impact Industries,* the Board had refused even to consider the company's evidence of work force turnover and the passage of time. 847 F.2d at 383. This court concluded that the Board was required to reexamine the availability of more traditional remedies in light of these changed circumstances: "At a minimum, the Board should have considered all the relevant evidence before determining that a bargaining order was warranted. This it failed to do and *for that reason* we must remand." *Id.* (emphasis supplied). By contrast, in this case, the Board accepted Montgomery Ward's evidence as accurate and concluded nonetheless that such evidence did not alter the propriety and necessity of the bargaining order, given the nature of the company's unlawful conduct. The Board examined all relevant evidence and determined that a bargaining order was required. That conclusion was not an abuse of the Board's discretion and should not be disturbed.

Although the Board delayed in resolving this case, it ultimately considered all the relevant evidence and yet concluded that a bargaining order was required in light of the company's numerous and flagrant unfair labor practices. The Board was entitled to conclude that these violations had a lasting effect serious enough to undermine a union election, even though the composition of the work force had changed significantly in the intervening eight years. This determination was not an abuse of the Board's discretion, and "the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had it considered the matter *de novo.*" *Indianapolis Power & Light Co. v. NLRB,* 898 F.2d 524, 529 (7th Cir.1990). I would therefore enforce the bargaining order.