**AMERICA'S BEST QUALITY COATINGS CORPORATION (ABQC), Petitioner–Cross–Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner,**

**and**

**United Electrical, Radio and Machine Workers of America, (UE), Intervenor–Petitioner.**

Nos. 93–4039, 94–1173, and 94–1198.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 4, 1994.

Decided Jan. 4, 1995.

James R. Scott, Alan M. Levy (argued), Lindner & Marsack, Milwaukee, WI, for petitioner.

John C. Truesdale, Robert J. Englehart, Contempt Litigation Branch, Aileen A. Armstrong, Linda J. Dreeben, Deborah E. Shrager (argued), Appellate Court, Enforcement Litigation, Washington, DC, Joseph A. Szabo, Director, N.L.R.B., Milwaukee, WI, for N.L.R.B.

Mary E. Leary (argued), Pittsburgh, PA, Terry Davis, Elizabeth Levie, United Electrical, Radio & Machine Workers of America, Milwaukee, WI, for United Electrical, Radio and Machine Workers of America.

James R. Scott, Alan M. Levy (argued) Lindner & Marsack, Milwaukee, WI, for ABQC Corp., America's Best Quality Coatings Corp.

Before CUDAHY and FLAUM, Circuit Judges, and ROSZKOWSKI, District Judge.*

FLAUM, Circuit Judge.

In this appeal, we consider a petition to set aside and a cross-petition to enforce an order of the National Labor Relations Board ("NLRB" or "Board"), which found that the petitioner employer, America's Best Quality

---

* The Honorable Stanley J. Roszkowski of the United States District Court for the Northern District of Illinois sitting by designation.

Corporation ("ABQC" or the "company"), violated §§ 8(a)(1), (3), and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1), (3), (5). The Board also concluded that Staff Right, Inc. ("Staff Right"), ABQC's employment and hiring agency, was a joint employer with ABQC, but was not jointly liable for these unfair labor practices. As a remedy, the Board's order required ABQC to cease and desist from any further unfair labor practices, and to reinstate terminated employees with lost wages and benefits. Furthermore, the order required ABQC to recognize the United Electrical Radio and Machine Workers of America Union (the "union"), and, on request, bargain with the Union as the exclusive collective bargaining representative of the employees. On appeal, ABQC challenges the appropriateness of the bargaining order and the Union challenges the Board's conclusion of no liability for Staff Right. We enforce the Board's decision and order.

## I.

ABQC is a closely held metal plating corporation located in Milwaukee, Wisconsin. ABQC began operations in June, 1990, after purchasing the corporate entity from the then union-organized Allen Bradley Company. Gene Plonka was ABQC's first President. During the first several months of employment, ABQC employees were promised both pay raises and additional vacation time, each effective one year after the employment began. In October, 1990, Robert Peterson succeeded Plonka as ABQC's President.

By March, 1991, ABQC employees had become concerned about the status of their promised raises and vacation time. Employees Michael Proffitt, Keith Mills, Lisa Nixon, Robert Person, Virginia Boyde, Sonny Anderson, and Curtis Celske circulated a union organizing petition and contacted union organizer Beth Levie. Thirty three employees signed this petition. In early April, the employees showed the petition to company supervisors Jane Lewandowski and Keith Stanosz, and demanded to be recognized as a group or union.

On April 12, Levie obtained 20 signed union authorization cards. By April 18, the union had 34 cards from ABQC's 64 employees. The Union formed an employee organizing committee. On April 18, this committee, along with union organizers Bob Clark and Levie, went to ABQC's offices and demanded voluntary recognition of the Union. After the company rejected this request, the Union filed a representation petition with the Board's regional office.

The following day, ABQC President Peterson announced that for an indefinite period, employees would be transferred from ABQC's payroll to Staff Right's payroll. Staff Right is a temporary employment agency that provides skilled and unskilled workers in the Milwaukee area which ABQC utilized to fill its employment needs. He stated that this "float" was the result of "cash flow" problems. This announcement scared the employees, who now believed that they were only "temporary" employees with less job security than before the transfer. On April 25, a group of 20–30 employees once again demanded union recognition by Peterson. He again refused. Both the Union and the company engaged in a variety of campaign activities in the weeks prior to the agreed upon election. ABQC's "game plan" opposing the union organizing effort included weekly meetings, mandatory speeches and questioning of employees. The union campaign included telephone calls and personal visits to employees as well as the distribution of literature.

ABQC engaged in several other campaign tactics to thwart unionization efforts. In a break from its usual practice, the company hired eight new employees just prior to the May 11 election eligibility cut off date. In the days leading up to the election, company officials questioned employees about their union views and threatened that they would enforce stricter working conditions if the employees voted for union representation. Peterson also required an employee to remove a pro-union leaflet, while not requiring the removal of anti-union signs. On June 17, at a mandatory employee meeting, Peterson informed the employees that he could not give any raises or change vacation schedules, de-

spite the elimination of the cash flow problem, because of the pending election. On June 21, the union representation election was held pursuant to an election agreement. 68 of the 72 eligible voters cast ballots: 30 for the Union, 29 against, and 9 ballots which the Union challenged.

On July 15, the company gave employees (and union organizing committee members) Proffitt, Mills, and Hicks warnings for poor attendance. On July 17, the three employees presented Peterson with a grievance, which he refused to accept because he did not formally recognize the Union. On the next day, 30 employees approached Peterson and demanded the raises and vacation time they had previously been promised. Peterson refused to act until the NLRB ruled on the pending union election challenges and objections.

On that same day, several storage tanks were sabotaged by acid from the metal plating machines, thus requiring the shut-down of those production units. With the machines no longer functioning, Peterson released the First Shift employees for the rest of the day. The following morning, the company refused to allow those employees to enter the plant and informed the employees that they were laid off until further notice. On July 22, the released employees began picketing the plant to protest their layoffs. On July 27, the company began to reinstate some of the First Shift employees, as the production needs required. Furthermore, the company notified its employees that it had decided to grant eligible employees the requested vacation time and merit wage reviews.

Although the company began recalling the laid off employees in late July, it did not do so based on seniority, experience or machine qualifications. Rather, the company recalled less senior employees ahead of the members of the union organizing committee. In fact, it did not recall any of the committee members until late October. In August, Peterson and company attorneys met separately on several occasions with Mills and Proffitt to discuss their involvement in the acid incident. Despite their denials, the company confronted both employees with evidence that they had sabotaged the plant. On February 24, 1992, after further investigation, the company discharged Mills and Proffitt.

Towards the end of October, ABQC decided to recall Nixon. A week after giving her a required drug test, the company notified Nixon that the test had been positive and that she no longer could work for the company. Despite Nixon's denial of any drug use, and her insistence on receiving a copy of the written drug report, the company refused to reconsider her discharge or provide her with the report.

In early September, 1991, the company also unilaterally issued its first employee handbook, making changes in the terms and conditions of employment, including wage structure, work hours, and policies regarding sexual harassment, drugs and alcohol, report pay, call-in pay, outside employment, solicitation, progressive discipline, paid time off, holidays and seniority. In late March, 1992, ABQC also unilaterally created formal job classifications, each with its own pay structure and wage range. ABQC modified the wage ranges for all job classifications in June, 1992.

On March 25, 1992, the Union filed unfair labor practice charges against ABQC. On June 15–18, 1992, and August 10–13, 1992, hearings were held on these charges. On March 1, 1993, the Administrative Law Judge ("ALJ") made detailed findings of fact and conclusions of law regarding these charges. The ALJ found that ABQC had violated §§ 8(a)(1), (3), and (5) of the Act, and ordered ABQC to cease and desist from further misconduct. The ALJ also ordered the reinstatement of discharged employees and issued a bargaining order. On November 26, 1993, on review, the Board affirmed most of the ALJ's findings and concluded that ABQC had violated §§ 8(a)(1), (3), (5) of the Act. The Board also found that 5 of the 9 election ballots challenged by the Union should be overruled, resulting in a 34 to 30 vote against the Union. Finally, the Board imposed a cease and desist order as well as a bargaining order to remedy these unfair labor practices. This enforcement action followed.

## II.

ABQC does not appeal the unfair labor practice findings, but rather only challenges the Board's bargaining order as an improper remedy. ABQC argues that because it did not prevent a fair election, a bargaining order is neither necessary nor appropriate. ABQC, despite the findings and conclusions of the ALJ and the Board, contends that neither its pre-election conduct, nor its post-election conduct, nor a combination of the two prevented a fair election at the time or prevents fair elections in the future.

■ We have jurisdiction to consider the parties' petitions pursuant to 29 U.S.C. § 160(e) and (f). *Electromation, Inc. v. NLRB and Teamsters,* 35 F.3d 1148, 1155–56 (7th Cir.1994); *Central Transport Inc. v. NLRB,* 997 F.2d 1180, 1184 (7th Cir.1993). We give substantial deference to the Board's conclusions and must uphold the Board's determinations if its factual findings are supported by substantial evidence. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole should be conclusive." 29 U.S.C. § 160(e); *see Ron Tirapelli Ford, Inc. v. NLRB,* 987 F.2d 433, 437 (7th Cir.1993); *Roadmaster Corp. v. NLRB,* 874 F.2d 448, 452 (7th Cir.1989) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)). We also will uphold the Board's legal conclusions if they have a reasonable basis in the law. *Electromation,* at 1155–56; *NLRB v. Augusta Bakery Corp.,* 957 F.2d 1467, 1471 (7th Cir.1992); *Local 1384, United Auto., Aerospace and Agric. Implement Workers of America, UAW v. NLRB,* 756 F.2d 482, 492 (7th Cir.1985). This deferential standard of review is consistent with Congressional intent to confer upon the Board the authority to develop national labor policy. *See International Ass'n of Bridge, Structural, and Ornamental Ironworkers, AFL–CIO, Local No. 111 v. NLRB,* 946 F.2d 1264, 1267 (7th Cir.1991) ("[o]ur standard of review is deferential in recognition of Congress' delegation to the NLRB of primary responsibility for national labor policy").

■ We have repeatedly recognized the Board's power, responsibility and broad discretion "to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Ron Tirapelli Ford,* 987 F.2d at 433 (quoting *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984)). Although we acknowledge that a bargaining order is "strong medicine and is to be implemented with the utmost care," *NLRB v. Q–1 Motor Exp., Inc.,* 25 F.3d 473, 481 (7th Cir.1994) (citations omitted), we will not substitute our judgment for that of the Board and will not interfere with the Board's choice of remedies absent an abuse of discretion. *Ron Tirapelli Ford,* 987 F.2d at 437. "The determination of the appropriateness of a bargaining order is, like all remedies, entrusted to the sound discretion of the Board." *Justak Bros. & Co. v. NLRB,* 664 F.2d 1074, 1081 (7th Cir.1981). In fact, we will not disturb the Board's remedial order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *NLRB v. Shelby Memorial Hosp. Ass'n.,* 1 F.3d 550, 555 (7th Cir.1993) (quoting *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218–19, 87 L.Ed. 1568 (1943)).

In the instant case, the Board, in adopting most of the findings and conclusions of the ALJ, found violations of §§ 8(a)(1), (3), and (5) of the Act. The Board concluded that ABQC violated § 8(a)(1) by coercively interrogating and threatening employees and by telling employees that they had been transferred to the payroll of Staff Right in order to scare them from supporting the Union. The Board also concluded that ABQC had violated §§ 8(a)(1) and (3) by laying off all bargaining unit employees, by discriminatorily delaying the recall of certain employees after the layoff because of their union sympathies or activities, and by suspending and terminating Mills, Proffitt and Nixon because of their union activities. The Board found additional §§ 8(a)(1) and (3) violations from ABQC's actions in delaying and then granting employment benefits before, during and after the union campaign as well as making unilateral changes in terms and conditions of employment. The Board determined that

the company violated §§ 8(a)(1) and (5) of the Act by refusing to recognize and bargain with the Union after the Union demanded such action and had obtained signed authorization cards from a majority of the company's production and maintenance employees. The Board further found that the company's unfair labor practices had rendered a fair rerun election unlikely. Finally, the Board found that ABQC and Staff Right were joint employers but that since Staff Right neither knew nor should have known about the company's discriminatory activities, Staff Right was not jointly liable for the above conduct.

The Board ordered ABQC to cease and desist from the unfair labor practices and any other interference with the employees' exercise of their § 7 rights. *See* 29 U.S.C. § 157. The order required ABQC to offer reinstatement (or the substantial equivalent), and recovery of lost earnings and benefits to Mills, Proffitt, Nixon and all first-shift bargaining unit members laid off or terminated after July 18, 1991. Further, the Board's order required ABQC to recognize the Union and, on request, bargain with the Union as the exclusive bargaining representative of employees of the appropriate unit.

The Supreme Court has held that the Board has the authority to issue such orders in order to prevent unfair labor practices which "have the tendency to undermine majority strength and impede the election process." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969); *see also NLRB v. Hicks Oils & Hicksgas, Inc.,* 942 F.2d 1140, 1141–42 (7th Cir.1991); *Montgomery Ward & Co., Inc. v. NLRB,* 904 F.2d 1156, 1158 (7th Cir.1990). To guide the NLRB in imposing this remedy, the Court concluded:

> In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that

employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Gissel,* 395 U.S. at 614–15, 89 S.Ct. at 1940.

■ An employer does not have to grant union recognition immediately when confronted by a recognition demand based on possession of cards allegedly signed by a majority of the employees. Rather, in certain circumstances, an employer can insist on an election. *Gissel,* 395 U.S. at 591, 89 S.Ct. at 1928. "If, however, the employer commits independent and substantial unfair labor practices disruptive of election conditions, the board may withhold the election or set it aside, and issue instead a bargaining order as a remedy for the various violations." *Gissel,* 395 U.S. at 591, 89 S.Ct. at 1928.

■ Before imposing a bargaining order, the Board must first review the nature of the unfair labor practices and the need for remedies. This Court's review of the Board's decision, once the Board has articulated the basis for its issuance of an order, is limited to whether the Board abused its discretion. *Montgomery Ward,* 904 F.2d at 1159 (quoting *Justak Bros.,* 664 F.2d at 1081). The Board must sufficiently analyze and discuss the adequacy of traditional remedies, "articulate the reason that traditional remedies would be inadequate to ensure a fair election," and "give specific reasons that justify its use of the bargaining order remedy." *Montgomery Ward,* 904 F.2d at 1159 (quoting *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1118 (7th Cir.1973)). The Board must also provide a "detailed analysis assessing the possibility of holding a fair election ... and the potential effect of ordinary remedies." *Montgomery Ward,* 904 F.2d at 1159 (quoting *Peerless,* 484 F.2d at 1118).

■ In the instant case, in satisfying the requirements of *Gissel* and *Montgomery Ward,* the unanimous Board carefully examined the ALJ's recommendations, discussed the unfair labor practices which occurred and, most importantly, articulated specific reasons why the bargaining order is the only

adequate remedy for the labor violations. The Board explicitly concluded that:

> [i]n agreeing with the [Administrative Law] judge that a *Gissel* bargaining order is a necessary component of the remedy in this case, we find that Respondent ABQC's course of misconduct, both pre- and post-election, clearly demonstrates that the holding of a fair election in the future would be unlikely.

The Board then proceeded to outline the principal unfair labor practices and their effect on the possibility of holding a fair election. The Board determined that "the possibility of erasing the effects of the Respondent's unfair labor practices is slight and the holding of a fair election unlikely." 313 N.L.R.B. 52 (1993). The Board thus recognized that "[a] bargaining order is designed as much to remedy past election damage as it is to deter future misconduct," *Gissel*, 395 U.S. at 612, 89 S.Ct. at 1939. The Board concluded, "Because of the serious nature of the violations and because the Respondent's egregious misconduct demonstrates a general disregard for the employees' fundamental rights, we find it necessary to issue a broad order requiring the Respondent ... to bargain with the Union."

The Board properly determined that the events surrounding the election fell into what we have previously termed the " 'classic' bargaining case ... the *Gissel*-type circumstance where the employer has thwarted its employees' efforts at organizing union representation." *Ron Tirapelli Ford*, 987 F.2d at 441. ABQC engaged in an election campaign which included threats by supervisors to be carried out in the event that the Union prevailed, interrogations, withholding of benefits and a refusal to bargain. Given both the ALJ's and Board's findings, we will not disturb the conclusion that ABQC's actions rise to the level of misconduct that merits the imposition of a bargaining order as part of the remedy. *See, e.g., Montgomery Ward*, 904 F.2d 1156 (bargaining order imposed after supervisors' threats of violence, surveillance, interrogation, discharge of union leaders); *Impact Indus., Inc. v. NLRB*, 847 F.2d 379 (7th Cir.1988) (bargaining order imposed after a refusal to bargain, threats of plant closure, threats of discharge, and other egregious employer activities resulting in Union's election loss).

■ ABQC argues, however, that the passage of time and the change of membership in the bargaining unit makes the bargaining order inappropriate. Specifically, ABQC contends that the 3 to 4 year delay before the imposition of a bargaining order denied the parties due process of law. We reject ABQC's arguments that this several year delay eliminates the need for a bargaining order. Only in extreme circumstances, where the delay has been of considerable length, has this Court concluded that a bargaining order is too stale for enforcement. *See NLRB v. Thrill, Inc.*, 980 F.2d 1137, 1143 (7th Cir.1992); *Montgomery Ward*, 904 F.2d at 1160. In *Thrill*, over a seven year gap existed between the time the ALJ issued the bargaining order and the Board's decision to impose the order. This Court emphasized the fact that the Board gave no reasons for the delay and concluded that in circumstances where the Board does not explain such a delay and there is a seven year gap, the bargaining order is stale. *Thrill*, 980 F.2d at 1143. In *Montgomery Ward*, an eight year gap existed between the election and the Board's order. This Court remanded for further consideration by the Board and noted that the passage of time can be a factor which the Board considers in determining the appropriateness of a bargaining order.

In the present case, there were no extreme gaps of time which would render the Board's order stale. The election occurred in June, 1991. The ALJ issued his opinion in March, 1993. The Board made its decision in November, 1993. The gap between opinions here was only four months, far short of the seven years in *Thrill*. Similarly, just over two years had passed here between the election and the Board's order as compared with the eight years in *Montgomery Ward*. While we recognize the concerns over stale orders and changed circumstances, *see Impact Indus.*, 847 F.2d at 383, we also acknowledge the ordinary institutional time lapses inherent in the legal process.

### III.

■ On cross-appeal, the Union argues that Staff Right should have been found jointly liable with ABQC for the unfair labor practices. Initially, the ALJ concluded that ABQC and Staff Right were not joint employers, and therefore could not be held jointly and severally liable for the back pay due employees as a result of ABQC's unlawful conduct. The Board, although concluding that ABQC and Staff Right were in fact joint employers,[1] agreed with the ALJ that ABQC was solely liable. The Board retroactively applied *Capitol EMI Music,* 311 N.L.R.B. 997, 1000 (1993), *enforced sub nom. Capitol EMI Music, Inc. v. NLRB,* 23 F.3d 399 (4th Cir.1994) (table), which held:

> [I]n joint employer relationships in which one employer supplies employees to the other, ... both joint employers [will be] liable for an unlawful employee termination (or other discriminatory discipline short of termination) only when the record permits an inference (1) that the nonacting joint employer knew or should have known that the other employer acted against the employee for unlawful reasons and (2) that the former has acquiesced in the unlawful action by failing to protest it or to exercise any contractual right it might possess to resist it.

The Board further applied *Capitol EMI* in allocating the burdens of determining joint employer liability. In *Capitol EMI,* the Board stated:

> The General Counsel must first show (1) that two employers are joint employers of a group of employees and (2) that one of them has, with unlawful motivation, discharged or taken other discriminatory actions against an employee or employees in the jointly managed work force. The burden then shifts to the employer who seeks to escape liability for its joint employer's unlawfully motivated action to show that it neither knew, nor should have known, of the reason for the other employer's action or that, if it knew, it took all measures

within its power to resist the unlawful action. [Footnote omitted].

In the instant case, the Board concluded that the Union met its burden of proving that ABQC and Staff Right were joint employers. The Board then determined that the burden shifted, and that Staff Right satisfactorily proved that it neither knew nor should have known of ABQC's unlawful actions. For this reason, the Board held that Staff Right was not liable for any of ABQC's actions.

We review the Board's decision with deference, examining the Board's findings and conclusions and verifying that its determinations are supported by substantial evidence in the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951); *NLRB v. Manley Truck Line, Inc.,* 779 F.2d 1327, 1330 (7th Cir.1985); *see also Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987) ("[i]f the Board adopts a rule that is rational and consistent with the Act ... then the rule is entitled to deference from the courts"). In the instant case, there is substantial evidence on the record considered as a whole to support the Board's findings and conclusions with regard to Staff Right. We agree with the Board's determination that although Staff Right and ABQC were joint employers, Staff Right neither knew nor should have known of the improper conduct and therefore is not jointly liable.

The Board properly applied *Capitol EMI* in determining the liability of Staff Right as a joint employer in the employment agency context. It concluded that "the undisputed evidence shows that Staff Right's role was limited to recruiting and supplying candidates for employment with ABQC and 'floating' the cost of ABQC's payroll from April 1991, to January 3, 1992." The Board determined that this limited role of Staff Right and the proffered testimony led to the determination that "Staff Right neither knew nor should have known about ABQC's discriminatory activities."

---

1. Respondents ABQC and Staff Right stipulated to their joint employer status during the period from April, 1991 to January 3, 1992 and admitted their joint employer status in their Answers to the complaint in the underlying unfair practice case. This is not an issue on appeal.

Substantial evidence in the record supports these conclusions and findings. Staff Right placed employees in the services of ABQC, advertised for, interviewed, screened and drug tested applicants. These activities, under the *Capitol EMI* framework, do not make Staff Right jointly liable. Although the Board ascertained that ABQC's transfer of employees to Staff Right's payroll was coercive, it was also reasonable for the Board to conclude that Staff Right did not know and had no reason to know that this action was taken with an anti-union animus. ABQC only informed Staff Right that it was in a cash bind and requested that Staff Right temporarily assume its payroll obligations, with a promise to subsequently reimburse Staff Right. From the record as a whole, Staff Right took "no part in the daily direction of the employees, [did] not participate in their oversight, and [had] no representatives at the worksite." *Capitol EMI*, 311 N.L.R.B. at 1000.

The Union also contends that in ABQC's agreement with Staff Right, the employment agency reserved the right to question any decision by ABQC regarding the termination of any Staff Right-referred employee. This agreement, however, gave Staff Right the authority to question discharges of employees only during the employee's initial 45-day probationary period with the company. The record indicates that ABQC did not discharge any probationary employees. Furthermore, because Staff Right had no knowledge of any ABQC misconduct, it had no reason to question any of the discharges.

For the foregoing reasons, we ENFORCE the Board's order.

ENFORCEMENT GRANTED.