**RON TIRAPELLI FORD, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**General Chauffeurs, Sales Drivers, and Helpers Union Local No. 179, Intervening Respondent.**

No. 91–3144.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1992.

Decided March 2, 1993.

Lawrence M. Cohen (argued), Diane E. Kristen, Fox & Grove, Chicago, IL, for Ron Tirapelli Ford, Inc.

Joan E. Hoyte (argued), N.L.R.B., Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, N.L.R.B., Region 13, Chicago, IL, Aileen A. Armstrong, Howard E. Perlstein, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B.

Roger N. Gold (argued), Gold & Polansky, Chicago, IL, for General Chauffeurs, Sales Drivers, and Helpers Union Local No. 179.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

RIPPLE, Circuit Judge.

Ron Tirapelli Ford, Inc. (Tirapelli Ford) petitions for review of an order of the National Labor Relations Board. Tirapelli Ford was found to have violated the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5) (1988) (sections 8(a)(1)

and (a)(5)).[1]  The Board determined that an employer-submitted "RM" election petition was void ab initio.  The representation election conducted as a result of that petition was declared a nullity.  The Board imposed a bargaining order and required that Tirapelli Ford make retroactive contributions to the Union fringe benefit funds.  The Board has submitted a cross-application for enforcement.  For the following reasons, we remand the fringe benefits issue for further findings.  We enforce the Board's order in all other respects.

# I

## BACKGROUND

### A. *Facts*

In late April or early May 1989, union employee William Bellinghiere expressed displeasure with his union [2] membership to Mr. Tirapelli, president of Ron Tirapelli Ford, and asked his advice about how to proceed.  Mr. Tirapelli then sought advice from the company attorney, who told him that Mr. Bellinghiere should contact the Board's Regional Office regarding decertification procedures.  Mr. Tirapelli conveyed this information to Mr. Bellinghiere, who subsequently drafted a decertification petition and again sought Mr. Tirapelli's advice.  Mr. Tirapelli told Mr. Bellinghiere that his attorney would review it; later the decertification petition was returned to Mr. Bellinghiere, and Mr. Tirapelli offered to assist Mr. Bellinghiere with the process after the requisite number of signatures had been obtained.

The Administrative Law Judge (ALJ) found that Mr. Tirapelli had assisted and encouraged the initiation of the employee petition and then coerced employees into signing it.  ALJ Decision at 6.  Mr. Tirapelli talked with union members Ramiro Caudillo, Edward Mance, and Jeff Momper in an effort to obtain their signatures on the petition.  At these interviews, Mr. Tirapelli promised them better benefits and a company profit-sharing plan when the Union was ousted.  He also made veiled threats and promises in coercive circumstances.  Specifically, the ALJ found Mr. Tirapelli's testimony to be unconvincing and evasive.  *Id.* at 3.  Mr. Tirapelli told Caudillo that he could get rid of Caudillo whether there was a union or not and that, if the Union went, Caudillo would be fully vested in a company fund that took the place of the pension plan.  *Id.*  The ALJ construed this encounter with Caudillo as an "implied threat of discharge."  *Id.* at 4.  Similarly, the ALJ found that Mr. Tirapelli had promised Momper a promotion and better benefits, and had offered veiled threats of discharge if Momper failed to cooperate.  *Id.* at 4–5.  Mr. Tirapelli also advised the employees not to mention the conversations to anyone else.[3]  When the signed petition was presented to Tirapelli Ford on May 9, Tirapelli Ford informed the Union that it had withdrawn its membership from the Auto Association and that the Association would not be authorized to represent it in negotiations with the Union for a new agreement.[4]  On May 30, 1989, Tirapelli Ford filed with the Board's Regional Office an RM election petition, supported by the decertification petition circulated by Bellinghiere and a

---

1. 29 U.S.C. § 158(a)(1) provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" in the exercise of rights provided in section 7 of the National Labor Relations Act.  Title 29 U.S.C. § 158(a)(5) provides that it shall be an unfair labor practice for an employer to "refuse to bargain collectively with the representative of his employees."

2. The General Chauffeurs, Sales Drivers, and Helpers Union Local No. 179 was the recognized bargaining representative for 6 of the 60 dealership employees.  A considerable percentage of the Tirapelli employees were not unionized.

3. Caudillo testified that Mr. Tirapelli had told him that if he discussed their conversation with anyone, Mr. Tirapelli would deny it.  ALJ Hearing at 136.  The ALJ found Caudillo's "frank" testimony to be more credible than Mr. Tirapelli's.  ALJ Decision at 4.  The ALJ also found Mance's testimony to be credible.  *Id.*  Mance testified that, after Mr. Tirapelli had offered him certain benefits, Mr. Tirapelli told him not to mention the offers to anyone.  ALJ Hearing at 121.

4. The Union's collective bargaining agreement with Tirapelli Ford was set to expire on July 31, 1989.

sworn affidavit from Mr. Tirapelli that he had reason to believe that the Union did not command a majority of employees. The Union and Tirapelli Ford later entered into a stipulated election agreement.

On June 19, Mr. Tirapelli met with the employees and outlined the company's allegedly superior insurance plan. When Momper balked, Mr. Tirapelli spoke with him privately. Tirapelli Ford argues once again that Mr. Tirapelli's remarks at the June meeting were but statements of opinion and fact that were not coercive. *See* 29 U.S.C. § 158(c); *Weather Shield Mfg., Inc. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989). The ALJ found Tirapelli's pre-election conversation with Momper to be threatening and coercive.

A tie vote in the July 11, 1989 election ended the Union's status as a collective bargaining agent. Tirapelli Ford then stopped making payments to the Union's health insurance and pension plans. After the election, the Union raised, apparently for the first time, questions about the validity of the underlying petition. Following the election, several employees disclosed Mr. Tirapelli's coercive conduct leading up to the petition for the decertification election. On August 15, 1989, when the Union requested negotiations toward a new agreement, Tirapelli Ford refused to bargain. The Union then brought unfair labor practice charges against Tirapelli Ford.

## B. *Board Proceedings*

On April 1, 1991, the ALJ issued his decision, and on August 27, 1991, the Board affirmed the decision in its entirety.[5] Both the ALJ and the Board determined that Tirapelli Ford had violated section 8(a)(1) by soliciting employees to oust the Union with promises of better benefits and by coercing and threatening employees into complying. In addition, it was found that Tirapelli Ford had violated section 8(a)(5) and (1) by withdrawing recognition of the Union, refusing to bargain with the Union, and unilaterally terminating fringe benefits plans in the collective-bargaining agreement. The Board agreed with the ALJ that both the tainted petition and the ensuing election should be nullified and the parties returned to their original positions. In addition to issuing a bargaining order, the Board ordered that the employer cease further unfair labor practices, rescind unilateral changes to wages and benefits, and reimburse the Union funds for any unpaid contributions for fringe benefits.

The remedy initially formulated by the ALJ and later ratified by the Board was based on the determination that the petition, and, therefore, the following election, were null and void. The Board confirmed the ALJ's conclusion that Tirapelli Ford was not justified in relying on the petition because it had "engaged in conduct designed to undermine employee support for, or cause their disaffection with the Union," ALJ Decision at 6 (citing *Hearst Corp.*, 281 N.L.R.B. 764 (1986), *aff'd*, 837 F.2d 1088 (5th Cir.1988)), and that the petition could therefore not support a valid election. ALJ Decision at 6 (citing *Hearst Corp.*, *supra;*

**5.** The Board also provided conclusions of law, which the ALJ had not done. The Board expressly concluded that Tirapelli Ford had violated section 8(a)(1) of the Act

[b]y promising employees better benefits if they get rid of the Union, interrogating employees concerning their union activities, soliciting employees by threats or promises to sign a petition to get rid of the Union, assisting employees in the preparation and circulation of a petition to get rid of the Union, threatening employees with discharge if they supported the Union, creating the impression that employee union activities are under surveillance, promising an employee a better position with more money if he signed a petition to get rid of the Union, and threatening an employee with the loss of the company's good

will and owner's helpful association unless the employee signed a petition to get rid of the Union....

Board Decision at 4.

In addition, Tirapelli Ford violated section 8(a)(5) and (1) of the Act by

withdrawing recognition from the Union, refusing to bargain with the Union as the exclusive bargaining representative of its employees in the bargaining unit described above, and by unilaterally changing or terminating fringe benefit plans contained in the collective-bargaining agreement, or unilaterally making any other changes in the terms and conditions of employment for bargaining unit employees without notifying or bargaining with the Union....

Board Decision at 4–5.

*Alexander Linn Hosp. Ass'n & Hosp.*, 288 N.L.R.B. 103 (1988), *enforced*, 866 F.2d 632 (3d Cir.1989); *Central Health Servs. Ass'n*, 279 N.L.R.B. 60 (1986)).

Both the ALJ and the Board rejected Tirapelli Ford's argument that a bargaining order was an inappropriate remedy in the absence of the analysis mandated by *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Board held that this case does not fall under the aegis of *Gissel* because this case, unlike *Gissel,* involves "an incumbent union that was the object of an unlawfully assisted decertification effort." Board Decision at 3. Because the Board found the election to be a nullity, it rejected Tirapelli Ford's argument that *Ideal Electric & Manufacturing Co.*, 134 N.L.R.B. 1275 (1978), barred the introduction of pre-petition unfair labor practices in an election challenge. According to the Board, this is not an election challenge: "the question whether the election should be set aside never became ripe for decision." Board Decision at 3. The Board further concluded that the Union could not have raised the unfair labor practices issue earlier because it did not learn of them until after the election.

## II

### ANALYSIS

#### A. *Standard of Review*

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e); *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1313–14 (7th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). Therefore, we must affirm the "Board's finding of an unfair labor practice if it is based upon substantial evidence on the record, and on reasonable inferences drawn from the facts as found." *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980).

▮ The Act confers on the Board the power and the broad discretion, as well as the responsibility, "to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984). "[T]he relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress." *NLRB v. MacKay Radio & Tel. Co.*, 304 U.S. 333, 348, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938). We examine the Board's choice of remedy to "assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." *Peoples Gas*, 629 F.2d at 42.

'Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.'

*Sure–Tan*, 467 U.S. at 899, 104 S.Ct. at 2812 (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941)). "It is the Board which is charged with the responsibility for ensuring that the Act's underlying goal of industrial peace through employee free choice is achieved, a responsibility which it could not discharge if it did not receive our respect for its judgment." *Peoples Gas*, 629 F.2d at 42. Therefore, this court may not substitute its judgment for that of the Board. *Sure–Tan*, 467 U.S. at 899, 104 S.Ct. at 2812. We shall not interfere with the Board's choice of remedies absent abuse of discretion. *See NLRB v. Transport Serv. Co.*, 973 F.2d 562, 566 (7th Cir. 1992).

▮ While the Board may select from a broad range of remedies, it must be remembered that the purpose of a remedy is to "undo the effects of unfair labor practices." *Sure–Tan*, 467 U.S. at 899, 104 S.Ct. at 2812. Therefore, "the proposed remedy [must] be tailored to the unfair labor practice it is intended to redress." *Id.* at 900, 104 S.Ct. at 2813. Of course, the remedy must not be punitive. *U.S. Marine*, 944

F.2d at 1322. One of the remedies available to the Board is a bargaining order, and " '[o]nce the Board has spelled out the basis for its issuance of a bargaining order, this court's review is limited to whether the Board abused its discretion.' " *Montgomery Ward & Co. v. NLRB*, 904 F.2d 1156, 1159 (7th Cir.1990) (quoting *Justak Bros. v. NLRB*, 664 F.2d 1074, 1082 (7th Cir.1981)). While a compensatory award will be reversed only on a finding that the Board abused its discretion, any award ordered by the Board must compensate for the injury actually suffered, that is, "expunge the *actual*, and not merely *speculative*, consequences of the unfair labor practices." *Sure–Tan*, 467 U.S. at 900, 104 S.Ct. at 2813.

### B. *Violations Under the Act*

Because we find substantial support in the record, and because Tirapelli Ford has not contested the Board's determinations of pre-petition misconduct, we summarily affirm the Board's finding that Tirapelli Ford violated section 8(a)(1) of the Act. *See Montgomery Ward & Co. v. NLRB*, 668 F.2d 291, 304 (7th Cir.1981) (uncontested violations summarily enforced). While the ALJ apparently found post-petition employer misconduct, he declined to consider its effect in light of the nullification of the election. The Board affirmed the ALJ's findings, but likewise saw no need to consider whether such conduct constituted unfair labor practices. We also affirm the Board's finding that Tirapelli Ford violated section 8(a)(5) of the Act in refusing to bargain following the election.

### C. *The Bargaining Order*

#### 1. Tirapelli Ford's position

Relying principally on *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), Tirapelli Ford's contention is that a bargaining order is an improper remedy. It notes that the Board did not find that the election was fatally poisoned by the pre-petition unfair labor practices. In Tirapelli Ford's view, the Board therefore should have respected the results of the election, "generally the most satisfactory—indeed preferred—method of ascertaining whether a union has majority support." *Gissel*, 395 U.S. at 602, 89 S.Ct. at 1934. "Where, as here, an election has been held, the only legitimate inquiries are then whether the election was unobjectionable and, if not, whether a fair second election can be held." Petitioner's Br. at 12. Tirapelli Ford submits, in essence, that the Board erred in imposing the bargaining order when there was allegedly no substantial evidence of unfair labor practices during the period between the filing of the election petition and the election. Tirapelli Ford argues that the Board refused to consider the principle articulated in *Ideal Electric* that only post-petition misconduct will be considered in making a challenge to the validity of an election. Under this view, the preliminary steps in the decertification process, even though they were admittedly tainted, become irrelevant once an election has expressed the will of the employees. Once a fair election has been held, Tirapelli Ford argues, the employees have exercised their rights under section 7,[6] and the taint on the underlying petition becomes a moot question. *Quick Find Co.*, 259 N.L.R.B. 1051, 1062 (1982) (referring to the original showing of interest in an organizing case). Tirapelli Ford stresses that the privacy of the voting booth normally insures fairness and that our only post-election inquiry should be whether the employer impeded the *election* process to such an extent that it is rendered unrepresentative of employee sentiment and that a second election would be similarly tainted. *Gissel*, 395 U.S. at 602, 613–14, 89 S.Ct. at 1934, 1939–40.

---

**6.** 29 U.S.C. § 157 provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

At oral argument Tirapelli Ford relied heavily on caselaw that applies the *Gissel* framework to cases involving withdrawal of recognition from an incumbent union and successor-employers. In those cases the courts acknowledge that a bargaining order is indeed a severe remedy to be employed only after the factual findings mandated by *Gissel* and its progeny regarding the validity of the election, the likelihood that a valid re-run cannot be held, and the inadequacy of less severe remedies.[7] In any case, Tirapelli Ford submits, the Board should not have excused the Union's failure to uncover the unfair labor practices until after the election, when it was too late to protest.

In support of its position, Tirapelli Ford notes that, had the Union uncovered the pre-petition unfair labor practices *prior* to the election, the election would have been deferred pending an investigation.[8] Tirapelli Ford contends that the Union's failure to exercise due diligence in uncovering the misconduct until after the election and its entry into a stipulated election agreement admitting that there was a valid question concerning representation preclude its reliance on pre-petition misconduct.

2. The Board's and the Union's positions

In defense of the Board's action, the General Counsel submits:

Simply put, this case involves an incumbent union that was the object of an unlawfully assisted decertification effort. The Company's unlawful efforts to get rid of the Union culminated in an unlawfully assisted employee petition disavow-

ing representation by the Union. The employee petition, in turn, formed the basis for the Company's filing of its RM petition on May 30, 1989. Since the RM petition itself was tainted by the Company's unfair labor practices, it and the subsequent election were a nullity, and, as the Board explained, "the parties [must be] restored to the status quo ante with respect to their bargaining relationship." (D & O 3)

Respondent NLRB Br. at 32–33.

The Union points out that there is precedent for the position of the Board. *See Hall Indus.*, 293 N.L.R.B. 785 (1989), *enforcing mem.*, 914 F.2d 244 (3d Cir.1990). In *Hall*, the Board found the decertification petition void ab initio because of egregious (and openly asserted) unfair labor practices. The subsequent election was nullified, and a bargaining order was instituted to restore the status quo ante. Both the Board and the Union contend that on these facts, and in light of the nullification of the election, a bargaining order is the proper remedy to restore the status quo.

3. Governing principles

   a. *judicial treatment of bargaining orders*

■ In the wake of *Gissel*, there is a consensus among the courts of appeals that the imposition of a bargaining order as a remedy is strong medicine and is to be implemented with the utmost care.[9] This caution is based on the concern that the imposition of such a bold remedy reflects an inadequate balancing of the competing interests of both employers and employees.

---

7. Tirapelli cited, among others, to *Sullivan Industries v. NLRB*, 957 F.2d 890 (D.C.Cir.1992) (successor employer); *Williams Enterprises, Inc. v. NLRB*, 956 F.2d 1226 (D.C.Cir.1992) (same); *St. Agnes Medical Center v. NLRB*, 871 F.2d 137 (D.C.Cir.1989) (withdrawal of recognition); and *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35 (D.C.Cir.1980) (withdrawal of recognition from incumbent union).

8. *See, e.g., Hancock Fabrics*, 294 N.L.R.B. 189 (1989); *Hearst Corp.*, 281 N.L.R.B. 764 (1986).

9. *See, e.g., Sullivan*, 957 F.2d at 904–05 (remanding for a reasoned explanation of the appropriateness of a bargaining order); *Montgomery*

*Ward*, 904 F.2d at 1159 (bargaining orders are a "last resort"); *St. Agnes*, 871 F.2d at 148 (remanding for the Board to indicate why a bargaining order best protects section 7 rights); *Impact Indus., Inc. v. NLRB*, 847 F.2d 379, 383 (7th Cir.1988) (remanding to consider the effect of changed circumstances on the bargaining order and noting that the Board did not consider the inadequacy of traditional remedies); and *Peoples Gas*, 629 F.2d at 50 (declining to enforce a bargaining order after seven years because it would contribute "to industry unrest rather than [restore] peace").

There has been no dissent to this caution in the cases of this circuit. Our hesitancy to approve Board-imposed bargaining orders stems from the concern, articulated by the Supreme Court in *Gissel*, for the section 7 rights of the employees. In *Montgomery Ward & Co. v. NLRB*, 904 F.2d 1156 (7th Cir.1990), we remanded for further findings a Board decision requiring a bargaining order in a certification election case. We recognized that the Board has broad remedial powers but also acknowledged that bargaining orders "due to their 'drastic consequence of forcing union representation on employees and forcing the employer to bargain, are not the favored remedy.'" *Id.* at 1159 (quoting *Justak*, 664 F.2d at 1081). In that case we concluded that the Board had adequately detailed the unfair labor practices, but had failed to consider whether other less drastic measures might be implemented to remedy them. *Id.* We also expressed our concern that the passage of time and changed circumstances since the original imposition of the order could render the remedy unrepresentative of employee sentiment. *See NLRB v. Thill, Inc.*, 980 F.2d 1137 (7th Cir.1992) (refusing to enforce the bargaining order after seven years); *Montgomery*, 904 F.2d at 1160 (reminding the Board, on remand, to consider changed circumstances); *NLRB v. P*I*E* Nationwide, Inc.*, 894 F.2d 887, 893–94 (7th Cir.1990) (citing additional authority).

The concerns that must be balanced in assessing the appropriateness of a bargaining order were first articulated in *Gissel*, a union organizing case. In *Gissel*, the Court recognized the efficacy of the bargaining order remedy in some cases, noting that

> [i]f the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him "to profit from [his] own wrongful refusal to bargain," *Franks Bros. [Co. v. NLRB*, 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944)]], while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could con-

tinue to delay or disrupt the election processes and put off indefinitely his obligation to bargain; and any election held under these circumstances would not be likely to demonstrate the employees' true, undistorted desires.

*Gissel*, 395 U.S. at 610–11, 89 S.Ct. at 1938. The *Gissel* Court outlined three situations to aid in determining when a bargaining order is warranted: Category I involves outrageous unfair labor practices; Category II involves practices that, while less outrageous, erode majority strength or adversely affect the election process; and Category III involves minimal unfair labor practices that would not warrant a bargaining order. *Id.* at 613–15, 89 S.Ct. at 1939–41.

Under this approach, the Court had no difficulty with the imposition of a bargaining order when the violations are outrageous and pervasive. The Court then went on to note that a bargaining order might also be appropriate in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940. In the less extraordinary cases, the Court stressed that

> effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Id.* at 614–15, 89 S.Ct. at 1940. In *Gissel*, the Court also noted, in defense of the use of bargaining orders in some circum-

stances, that "if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a representation petition." *Id.* at 613, 89 S.Ct. at 1939. In elaborating on the mandate of *Gissel,* our colleagues in the District of Columbia Circuit have written:

> if the employer's violation is deliberate and egregious enough, the interest in deterrence of future violations may override the employees' wishes, especially if it is likely that the workers' rejection of the Union flows from the Company's violations.
>
> When the violation is less substantial or is committed in good faith, the interest in deterrence is less substantial as well. Correspondingly, the employees' rights to decide whether they want Union representation, and by which Union, should be given greater weight....

*Peoples Gas,* 629 F.2d at 47.

█ Determining the appropriateness of a bargaining order requires, then, careful analysis of the nature of the misconduct and its lasting effects. The Board may not ignore the section 7 rights of the employees to express their preferences; however, it also must not countenance serious employer misconduct and the remedy must be severe enough to deter effectively such future conduct. In achieving this balance,

the Board must follow the dictates of *Gissel* and its progeny and consider whether less drastic measures would serve the balance of interests. At all times, the Board is charged with accomplishing and articulating this balance of interests against the backdrop of its obligation to craft a remedy for employer misconduct that is remedial rather than punitive. *NLRB v. Strong,* 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *U.S. Marine,* 944 F.2d at 1322.

The "classic" bargaining order case is, of course, the *Gissel*-type circumstance where the employer has thwarted its employees' efforts at organizing union representation.[10] In such cases, the courts have recognized the efficacy of the bargaining order only after a determination that the unfair labor practices have rendered an election an unreliable means of testing the union's claim of majority.

Courts have also extended the *Gissel* analysis to situations where there is an incumbent union majority and withdrawal of recognition by the employer or by the successor employer. When an employer withdraws recognition, courts have recognized that a bargaining order poses a threat of "frustrating rather than furthering the purposes of the Act, since they may be contrary to the actual wishes of the employees." *Peoples Gas,* 629 F.2d at 46 n. 21.[11] They have also recognized, howev-

---

10. *See, e.g., Montgomery Ward,* 904 F.2d 1156 (bargaining order imposed after supervisors' threats of violence, surveillance, interrogation, discharge of union leaders); *Impact Indus.,* 847 F.2d 379 (bargaining order imposed after a refusal to bargain, threats of plant closure, threats of discharge, and other egregious employer activities resulting in the Union's election loss); *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679 (7th Cir.1982) (bargaining order imposed after the general manager and operations manager retaliated for union organizing by threatening reduced work, threatening termination of employment and benefits, and assaulting union picketers). The *Berger* court expanded on the effects of the unfair labor practices on the election process by identifying factors that increased the likelihood of an unfair election: the fact that upper-level management had committed the misconduct and that unfair labor practices carry added impact when the bargaining unit is small and the violations are not minor. *Berger,* 678 F.2d at 694. These factors are present in this case.

11. Other withdrawal of recognition cases that have expressed similar concerns about frustrating employees' preferences include *Automated Business Systems v. NLRB,* 497 F.2d 262 (6th Cir.1974); *Daisy's Originals, Inc. v. NLRB,* 468 F.2d 493 (5th Cir.1972), and *Fremont Newspapers, Inc. v. NLRB,* 436 F.2d 665 (8th Cir.1970).

In *St. Agnes,* 871 F.2d at 146, a decertification election was set aside because of pre-election unfair labor practices that served to disrupt the "laboratory conditions" required for a valid election. *See Rosewood Mfg. Co.,* 263 N.L.R.B. 420 (1982). The *St. Agnes* court remanded, however, for the Board to justify its imposition of a bargaining order. *St. Agnes,* 871 F.2d at 148. The court was also clear that it remanded first because it was not convinced that the record revealed the sort of anti-union bias that the ALJ and the Board had found. Second, it required a detailed analysis of why a fair rerun election could not be held.

er, that "deterrence and industrial stability emerge as important considerations." *Id.* at 47 n. 23. In a successor-employer setting, somewhat different considerations appear to obtain.[12] In *Sullivan Industries v. NLRB*, 957 F.2d 890 (D.C.Cir.1992), a successor employer case, the court found that the employer's pre-petition statements violated section 8(a)(1), and the risks were high that the union labor practices effectively undermined support for the incumbent union and would taint a subsequent election. The court remanded for both an examination of the causal nexus between the unfair labor practice and the subsequent disaffection with the union and for a careful balancing of employee/employer interests. *Sullivan*, 957 F.2d at 904–05.

### b. *bargaining orders in the employer-engineered petition situation*

The instant case presents another variation on the cases involving an incumbent union. In the Board's view, it is a very significant variation—not one of degree but one of kind. The critical difference, from the Board's perspective, is the involvement of the employer in the development of the petition itself and its subsequent misrepresentations to the Board with respect to the basis of the RM petition. These factors, the General Counsel argues, justify an analysis substantially different from the *Gissel* analysis used in other representational cases involving employer misconduct, whether they involve an incumbent or a non-incumbent union.

The Board has long taken the view that an employer-assisted decertification petition ought to be canceled and the party returned to the status quo ante.[13] The petition, tainted by the employer's unfair labor practices, is a nullity. Typically, the objections to the unfair labor practices leading to the decertification petition are filed during the pre-election period, and the Board's finding of impermissible employer involvement results in a canceled election.[14] The issue of whether election results ought to be respected simply never arises. Here, however, the tainted decertification petition became the basis of an election before the employer's illegal conduct came to light. In the Board's view, the holding of the election ought not alter the result. The tainted petition is a nullity; the resulting election is a nullity.

In evaluating this position, we must, at the outset, recall that the issue before us is, at bottom, one of selection of remedies. In matters of remedies, we accord, as we have already noted, great latitude to the Board. *Sure–Tan*, 467 U.S. at 898–99, 104 S.Ct. at 2812–13. As we noted in *Justak*,

> [e]laborate explanations are not essential; indeed, scientific accuracy in estimating the impact of unfair labor practices is impossible. Rather, we only require that the Board delineate the factors that it considers in its estimation, and describe how these factors have been weighed.

---

**12.** The Supreme Court has stressed that the employees' freedom to express preferences is particularly vulnerable:

> If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation.... [T]hey might be inclined to shun support for their former union, especially if they believe that such support will jeopardize their jobs with the successor or if they are inclined to blame the union for their layoff and problems associated with it.

*Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 39–40, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987). In *Fall River,* the Court went on to suggest that the unprincipled successor employ-

er could capitalize on employee uneasiness to encourage the ouster of the union. *Id.* at 40, 107 S.Ct. at 2234. The Court reaffirmed the principle, first articulated in *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), that a successor employer has an obligation to bargain with its predecessor's union.

**13.** *See, e.g., Hall Industries, Inc.,* 293 N.L.R.B. 785 (1989); *Alexander Linn Hosp. Ass'n,* 288 N.L.R.B. 103 (1988); *Placke–Toyota,* 215 N.L.R.B. 395 (1974); and *Texaco, Inc.,* 264 N.L.R.B. 1132 (1982).

**14.** *Peoples Gas,* 629 F.2d at 40 n. 8. *See, e.g., Williams,* 956 F.2d 1226; *Hancock Fabrics,* 294 N.L.R.B. 189 (1989); *Hearst Corp.,* 281 N.L.R.B. 764 (1986).

*Justak,* 664 F.2d at 1081. Tailoring a remedy to fit a particular violation of the Labor Act requires that the Board draw upon considerable expertise both with respect to the interpretation of the Labor Act and with respect to the pragmatics and practicalities of labor relations.

■ In its submission to us, the Board emphasizes that employer involvement in the sponsorship of the petition not only prejudiced the electoral process almost from its very beginning but also "effectively abused the Board's processes, if not section 9 of the Act itself." Respondent NLRB Br. at 34. In our view, the Board acted well within the discretion given it by Congress when it determined that, in light of these considerations, such a petition ought to be held invalid, even in the comparatively rare case, such as this one, where the election occurs before the discovery of the illegality. The direct insinuation of the employer into the election process through the filing of a bogus petition requires the Board to confront several serious issues that require firm and decisive action on its part. As the General Counsel suggests, the action of the employer is not only a serious violation of the Labor Act but a *direct* abuse of the Board's electoral process itself. The Board has the right, we believe, to protect the integrity of those processes by declaring the bogus petition and the election it produces null and void.

In other circumstances, where there is a violation of the Labor Act by an employer during the pre-election period, the Board has determined, as a general rule, that only post-petition conduct is relevant to the Board's determination as to whether the employer's conduct affected the election results. *See Ideal Elec.,* 134 N.L.R.B. 1275 (1978). Here, however, the employer not only affected the results, it staged the entire electoral process. Under these circumstances, the Board certainly was justified in concluding that the purposes of the Labor Act could only be preserved by nullification of the entire scheme.

Indeed, as the facts of this case amply demonstrate, in employer-assisted decertification petition situations, there is, as a practical matter, a certain artificiality in drawing a rigid distinction between pre-petition and post-petition conduct. As we have previously noted, if the employer's engineering of this process is discovered, the usual remedy is to declare the petition void and to cancel the election. *Peoples Gas,* 629 F.2d at 40 n. 8. Consequently, it was in Mr. Tirapelli's interest to proceed discreetly, and he warned those whom he coerced not to disclose his comments. Consequently, it was not until after the election that his behavior became known. Not surprisingly, the Board determined that the Union's failure to uncover the illegality prior to the election was understandable, a conclusion amply supported by the record. Board Decision at 3.

The Board was entitled to conclude that considerations of deterrence and the stability of existing bargaining relationships vastly outweigh the rather remote possibility that an election conducted under these circumstances might reflect the desires of the employees. "[D]eterrence and industrial stability emerge as important considerations," *Peoples Gas,* 629 F.2d at 47 n. 23, in these circumstances. Consequently, as did our colleagues in the Third Circuit in *Hall Industries,* we believe the Board acted within the scope of its authority when it declared the petition void and held that the election was a nullity.

### D. *Other Aspects of the Remedy*

■ Although we believe that the Board acted within its authority in declaring the petition void and considering the election a nullity, we believe that the remedy fashioned by the Board is in need of clarification in one respect. We believe that the matter of fringe benefits must be examined in more detail. Awards must compensate for the injury actually suffered by the employees; they must expunge "the *actual,* and not merely *speculative,* consequences of the unfair labor practices." *Sure–Tan, Inc.,* 467 U.S. at 900, 104 S.Ct. at 2813. The Board's order will be affirmed unless the order " 'is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Fibreboard Paper Prods. Corp. v. NLRB,*

379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).

■ Tirapelli Ford objects to the requirement that the company must pay retroactive contributions, without offsets, to the Union's fringe benefit funds. Despite the apparent understanding that the specifics of the repayment of unpaid contributions would be litigated fully in the compliance phase, ALJ Hearing at 311, the Board nonetheless ratified the ALJ's order that Tirapelli Ford reimburse the employees "for any wages or benefits they may have lost as a result of its unlawful unilateral changes, with interest." ALJ Decision at 9; Board Decision at 2 n. 2. Tirapelli Ford asserts that the award is speculative because it presumes, without record support, that the employees "have an economic stake in the future financial stability of the Union funds." Petitioner's Br. at 19.

In affirming the ALJ's order, the Board acknowledged *Manhattan Eye, Ear & Throat Hospital v. NLRB*, 942 F.2d 151 (2d Cir.1991), which refused to enforce an order for the employer to pay retroactive benefits because the employees had been compensated in the interim by other plans and had disclaimed an interest in being covered by the funds. The court determined that because the employees had

> little economic stake in the future financial stability of those funds, imposition of the *status quo ante* does not serve the remedial purposes of the Act because it fails to benefit the employees, is unduly harsh on the employer, and results in a windfall for the union funds.

*Id.* at 159–60. The Board distinguished *Manhattan* on its particular facts because the employees here continue to be repre-

sented by the Union and are interested in the continuing viability of the funds.[15] Board Decision, at 2 n. 2.

Tirapelli Ford relies on *Manhattan* because the Union employees were also allegedly covered under Tirapelli Ford's plans; therefore they are only entitled to compensation for any discrepancy in coverage. In addition, Tirapelli Ford argues that it is uncertain that continued negotiations would have resulted in payment to the Union funds. The company acknowledges that, assuming the Tirapelli Ford plan met the members' needs, it might be possible to show that an interest in the viability of the fringe benefit funds was adversely affected by the failure to make contributions under *Stone Boat Yard v. NLRB*, 715 F.2d 441, 446 (9th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). Petitioner's Br. at 21. Tirapelli Ford maintains, however, that, in the absence of litigation on this issue, the question of future interest or the effect on Fund viability posed by the loss of contributions on behalf of only six employees cannot be shown.

Recently, in *NLRB v. Transport Service Co.*, 973 F.2d 562 (7th Cir.1992), this court upheld such a full reimbursement order after an employer's unlawful failure to make pension, health, and welfare fund payments. The court relied on *Stone Boat*, where the employer argued that overdue payments need not be made because they did not reflect employee loss and provided for no offset for the benefits conferred by the employer's plan. The *Stone Boat* court held that the employer was in a poor position to complain about the extra costs when it had illegally withheld the payments: "[e]ven if [the employer's] fringe benefit program met the present needs of its employees, the diversion of contributions from the union funds undercut the ability of

---

**15.** The theory behind the future viability concerns was well expressed in *Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988):

> A pension or welfare trust is a third-party beneficiary of the collective-bargaining agreement. It receives the contributions (and makes the payments) negotiated by others. The actuarial calculations that produce the contribution and payout systems are based on the supposition that the funds will receive full

contributions on behalf of all employees covered. If a local union and an employer try to shrink the duty to contribute without notice to the funds and a contraction of the funds' obligations, the fund may end up paying benefits without corresponding contributions. In the long run, the shortfall must be made up by lower benefits or higher contributions from other employers.

*Id.* at 333 (citations omitted).

those funds to provide for future needs." *Stone Boat,* 715 F.2d at 446. Likewise in *Transport Service,* the court acknowledged the inevitable impact of nonpayment on the future viability of the Fund, even though only three employees were implicated. *Transport Service,* 973 F.2d at 569. *Transport Service* distinguished *Manhattan* in the same way that the Board did in the instant case: "The employees at issue were not even represented by the union at the time of the hearing, and the union had disclaimed any future interest in representing them. Without any concrete evidence of the employees' economic interest in the future of the fringe benefit funds, any harm to the employees was purely speculative." *Id.* at 569 n. 3. We remand the question of the amount of reimbursement to the Board for further inquiry in light of the considerations raised by the caselaw we have cited.

## Conclusion

For the foregoing reasons we affirm the Board's decision that a bargaining order is the appropriate remedy to return the parties to the status quo ante. We remand the matter of retroactive payments of fringe benefits to the Board for further findings consistent with this opinion. Tirapelli Ford shall bear the costs of this appeal.

ENFORCED IN PART, REMANDED IN PART.