**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**Union of Needletrades Industrial and Textile Employees, Local 76, Intervening Petitioner,**

v.

**INTERSWEET, INCORPORATED, Respondent.**

No. 96–3528.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1997.

Decided Sept. 17, 1997.

Jill A. Griffin, Richard A. Cohen (argued), National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, National Labor Relations Board, Chicago, IL, Aileen A. Armstrong, Frederick Havard, National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

Mark L. Juster, Joseph M. Gagliardo, Michael Klupchak, Jeffrey S. Fowler (argued), Marc J. Siegel, Jill O'Brien, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for Respondent.

William A. Widmer, III, Martin P. Barr (argued), Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL, for Intervening Petitioner.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

In January 1993, sugar wafer manufacturer Intersweet, Inc. responded to a union organizing effort in its plant by terminating its entire workforce. It subsequently refused to rehire most of the union cardsigners and chose inexperienced workers to replace them. To make matters worse, the company's management questioned workers about their union affiliation and told them that the terminations were related to union activity. The International Ladies' Garment Workers' Union Local 76, AFL–CIO ("the Union"),[1] filed a complaint with the National Labor Relations Board ("NLRB"), which resulted in a seven-day hearing conducted in the summer and fall of 1994. The administrative law judge found that Intersweet had violated sections 8(a)(1) and (3) of the National Labor Relations Act (29 U.S.C. § 158(a)(1) and (3)), and recommended that the Board impose a bargaining order of the type authorized by the Supreme Court in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). *Intersweet, Inc. and International Ladies' Garment Workers' Union Local 76, AFL–CIO,* 321 NLRB 1, 1996 WL 196549 (1996). On April 22, 1996, after considering Intersweet's exceptions, the Board upheld the ALJ's decision and adopted her recommendations. The Board now petitions this court for enforcement of its order. Intersweet does not contest the Board's finding of unfair practices, but objects to the *Gissel* bargaining order that the Board imposed, arguing that the order was no longer appropriate because of changed circumstances. We disagree and grant the Board's petition for enforcement.

## I. Background [2]

After founding Intersweet, Inc., in 1974, owner Julius Meerbaum served as president of the company until 1986, when he retired and moved from Illinois to Florida. From that time until 1992, Julius was not involved in the company's day-to-day operations, although he retained ultimate decisionmaking authority. Daily management was taken over by Julius' son and son-in-law, John Meerbaum and David Sabin. In 1992, when John Meerbaum decided to reduce his workload, Julius once again became active in management. Focusing his efforts largely on production, Julius spent about ten days each month at the plant. In addition to the Meerbaums and Sabin, Intersweet's management team in 1993 included front-line supervisors Ignacio Alfonso Marquez and Jose Diaz, the only managers able to communicate with the company's mostly Spanish-speaking workforce.

In December 1992 and January 1993, the Union conducted three organizational meetings with Intersweet workers and distributed cards authorizing union representation for employees to sign. By late January, nineteen of the company's thirty-one employees had signed union cards. On January 26, 1993, Julius Meerbaum decided to shut down the plant and terminate all of its employees. He called Sabin from Florida with the decision, which was implemented that same morning by Sabin, Diaz and Marquez. With wafers in mid-production, workers were told to leave the plant at once because the company had run out of funds to pay their wages. On January 27, the very next day, Julius instructed Diaz to recall ten of the thirty-one employees who had been terminated. The plant was to be operated at less than its full capacity, and according to Intersweet, the recalled employees were those most efficient at operating the machines that were still to be used. Nonetheless, only two of those recalled, Fermin Rivera and Sergio Roman, had signed union cards. In addition, neither Rivera nor Roman had attended the union meetings, and Rivera had denied awareness of the union campaign when Diaz had asked him about it several weeks earlier.

When the plant resumed operations on February 2, the smaller workforce was required to work fifty or sixty hours per week instead of the forty hours it had formerly

---

**1.** The International Ladies' Garment Workers' Union is now the Union of Needletrades, Industrial and Textile Employees. The Union has intervened in support of the Board's petition.

**2.** Intersweet does not contest the factual findings of the ALJ, from which our own factual summary is derived.

worked. The company also increased the speed of its machines and automated some tasks that had previously been manual. Two additional employees, both non-signers, were recalled during February. In March, the company advertised job opportunities in a Polish-language newspaper and hired two Polish-speaking employees who were soon fired because of communication problems. The company then began to advertise in Spanish-language papers, and on March 17, it hired eleven Mexican employees who had never before worked for the company. During the remainder of March and early April, the company continued to advertise job openings in Spanish-language papers and hired a total of fifteen new employees. Most members of the newly-comprised workforce put in many overtime hours.

The violations of section 8(a)(1) arose from the conduct of Diaz toward Rivera and Roman, the two card-signing employees who were recalled after the shutdown. In mid-January, before the en masse firings, Diaz asked Rivera whether he knew about the Union, and although Rivera had already signed his union card, he replied that he did not. In mid-February, after the shutdown and reopening of the plant, Roman heard Diaz tell Marquez that the terminated employees were all "pendejos" (idiots) because Intersweet management had been aware of their union activities. Roman then asked Diaz why the employees had been discharged and Diaz responded that "the Union wasn't good for the Company, it wouldn't benefit them." Rivera also overheard this conversation. Later, after Intersweet had begun hiring new workers, Rivera asked Diaz why the company was not rehiring its former employees instead, and Diaz responded that they were not being brought back because of their union activity. Rivera subsequently overheard a conversation between Marquez and Diaz, conducted while he was within their sight. Marquez suggested to Diaz that they bring back some of the former employees to train the newcomers and Diaz responded, "no, they were not coming back here to work because they were in the Union." Finally, after the new workers had been hired in mid-March, Roman complained to Diaz that they were making many mistakes and suggested

that the old workers should be recalled to replace them. Diaz replied by saying, "[t]hey weren't going to call them back again because of the Union."

Based on these factual findings, the ALJ found that Intersweet had committed "outrageous unfair labor practices ... whose coercive effects cannot be eliminated by the application of traditional remedies...." 321 NLRB at 19 (citation and internal quotation omitted). She therefore recommended imposition of an order requiring Intersweet to bargain with the union in the absence of an election. The Board affirmed the ALJ's order after considering Intersweet's arguments that it was no longer necessary because of a change in circumstances. Intersweet reiterates those arguments here, but we are also unpersuaded and grant the Board's petition for enforcement of its order.

## II.

■■■ In considering the Board's petition for enforcement, we respect its "broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *America's Best Quality Coatings Corp. v. NLRB*, 44 F.3d 516, 520 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995) (internal quotation omitted). We therefore review the Board's decision with deference and will interfere only if the Board's order reflects an abuse of its discretion. *NLRB v. Q–1 Motor Express, Inc.*, 25 F.3d 473, 480 (7th Cir.1994), *cert. denied*, 513 U.S. 1080, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). We must accept the factual findings of the Board so long as they are supported by substantial record evidence, and we will uphold the Board's legal conclusions "if they have a reasonable basis in the law." *America's Best*, 44 F.3d at 520 (citing 29 U.S.C. § 160(e)).

■■■ In *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court first enforced a Board order requiring an employer to bargain with a union in the absence of an election. The Board had imposed the order after finding that the employer's unfair labor practices were likely to have precluded a fair

election. The Supreme Court approved the use of such bargaining orders in response to "'outrageous'" or "'pervasive'" unfair practices "'if they are of such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.'" 395 U.S. at 613–14, 89 S.Ct. at 1939–40 (quoting *NLRB v. S.S. Logan Packing Co.*, 386 F.2d 562, 570 (4th Cir.1967)).[3] We have noted that the imposition of such an order is "'strong medicine ... to be implemented with the utmost care.'" *America's Best*, 44 F.3d at 520 (quoting *Q–1 Motor Express*, 25 F.3d at 481). We therefore have required that before imposing such an order, the Board consider whether more traditional remedies might suffice and articulate its reasons for rejecting them. *America's Best*, 44 F.3d at 521. Although we will find an abuse of discretion if the Board fails to adequately consider alternatives and explain its choice, we will not otherwise disturb the Board's decision "'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Id.* at 520 (quoting *NLRB v. Shelby Memorial Hosp. Ass'n*, 1 F.3d 550, 555 (7th Cir.1993)).

Here, the Board upheld the ALJ's determination that Intersweet's unfair practices were so extreme that traditional remedies could not cure them. It also responded point by point to Intersweet's contentions that the order should be modified due to the passage of time and the change in circumstances, which Intersweet characterized as a turnover in both management and labor. We agree with the Board's assessment and find no abuse of its discretion.

## A. Passage of Time

■ Intersweet's NLRA violations occurred in early 1993, and the Union first complained to the NLRB in August of that year. The ALJ conducted a hearing in the summer and fall of 1994, and issued her opinion on March 28, 1995. The Board followed with its decision adopting the ALJ's recommendations on April 22, 1996. In all, then, just over three years had passed between the time of the violations and the imposition of the *Gissel* order. Intersweet argues that the passage of that period and the resulting change in circumstances justified a modification of the remedy. The Board considered this argument and found that the passage of three years was attributable to the normal course of litigation and was shorter than the periods found to raise questions about the continued propriety of the *Gissel* remedy in other cases. It believed that the passage of time could not have erased the chilling effect of Intersweet's extreme practices from the culture of the plant, so that a bargaining order was still appropriate.

It is true, as Intersweet contends, that the passage of time has persuaded us in several cases to deny enforcement of a *Gissel* bargaining order and to require consideration of less drastic alternatives. As examples, Intersweet cites *Montgomery Ward & Co., Inc. v. NLRB*, 904 F.2d 1156, 1160 (7th Cir.1990), in which eight years had passed between the unfair practices and the imposition of the order, and *Impact Industries, Inc. v. NLRB*, 847 F.2d 379, 381 (7th Cir.1988), in which seven and a half years had passed. *See also NLRB v. Thill, Inc.*, 980 F.2d 1137, 1138 (7th Cir.1992) (enforcement of a *Gissel* order denied when more than nine years had elapsed). But those cases are clearly distinguishable on several grounds. First, in each of those cases a much lengthier period had passed between the unfair practice and the imposition of the order than the three years that had transpired here. The time frame in this case more closely resembles the three to four years that had passed in *America's Best*, 44 F.3d at 522. In that case we enforced a bargaining order, finding the time period to be an "ordinary institutional time lapse[ ] inherent in the legal process," that was distinguishable from the longer periods found

---

**3.** This describes what has come to be known as a "*Gissel* I" violation. The court went on to discuss an additional category, known as "*Gissel* II," which involves conduct that is less outrageous but may still justify the imposition of a bargaining order. *Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940–41. Intersweet has not contested the Board's finding that its practices constituted category "I" *Gissel* violations.

questionable in *Montgomery Ward* and *Thill*. *Id.*

In addition, in *Montgomery Ward, Impact Industries,* and *Thill,* a significant portion of the delay was attributable to the Board's own procrastination. In those cases, six years, five and a half years, and seven years, respectively, had intervened between the ALJ's decision and the Board's final order. *Montgomery Ward,* 904 F.2d at 1160; *Impact Industries,* 847 F.2d at 381; *Thill,* 980 F.2d at 1138. That contrasts with this case, where the Board issued its decision one year after the ALJ had done so, a period more consistent with the "ordinary course" of litigation. Moreover, in each of the earlier cases, we found unacceptable the Board's failure to explain its own delay or to consider the impact of the extraordinary time lapses on the continued necessity of the *Gissel* remedy. That failure was the focal point of our analysis in both *Montgomery Ward* and *Impact Industries* and the basis for our finding that the Board had abused its discretion. *Montgomery Ward,* 904 F.2d at 1159–60; *Impact Industries,* 847 F.2d at 383; *see also Thill,* 980 F.2d at 1142–43. In this case, the Board has thoroughly considered a time lapse that was, in any event, much less remarkable. We find no abuse of the Board's discretion.

### B. Change in Management

■ Between the time of the mass terminations and the imposition of the *Gissel* order, Julius Meerbaum, who had been responsible for the shutdown of the plant in 1993, passed away. Intersweet argues that Julius' death obviated the need for the bargaining order by removing any lingering impact of the unfair practices for which he was responsible. Intersweet again cites *Montgomery Ward* and *Impact Industries,* this time for the proposition that new management may constitute a change in circumstance that renders a previously-imposed bargaining order unnecessary. But those cases are again distinguishable. In *Impact Industries,* both co-owners responsible for the unfair practices

had passed away, and at the time of the Board's order, the company was run by trustees who were unrelated to the original owners. Only one individual related to the original owners still worked at the company, and he was not involved in its management. 847 F.2d at 383. In *Montgomery Ward,* 904 F.2d at 1160, only one of thirteen managers involved in the illegal practices was still at the plant.

Here, although Julius Meerbaum had passed away, three members of Intersweet's previous management staff, John Meerbaum, Jose Diaz and David Sabin were still running the company. Thus, aside from the fact that Julius was gone, Intersweet's management had not meaningfully changed, and the company was still controlled by the Meerbaum family. The Board therefore reasoned that Julius' death did not vitiate the effect of the unfair practices. In fact, because the individuals that were still present had been responsible for implementing Julius' directive to shut down the plant, the Board found that they may be more closely associated with the terminations than Julius himself, whose involvement was remote and perhaps even unknown to the workers. In addition, the comments that violated section 8(a)(1) were made by Diaz, who was among those still present. Unlike *Montgomery Ward* and *Impact Industries,* then, the management in this case had not meaningfully changed hands. The Board considered the change that had occurred, and found that the bargaining order was still necessary. Again, we find no abuse of discretion.

### C. Change in Workforce

■ The Board accepted as true for purposes of its analysis Intersweet's assertion that only nine of the original thirty-one employees were still working at the company when the bargaining order was imposed, and that the workforce had grown to include 105 new employees that had not been present in January 1993.[4] The Board noted, however, that of the original thirty-one employees, eighteen had not returned because of Inter-

---

4. The Board found that there were 114 employees on April 8, 1995 and that the workforce was

expected to grow to 150 by the end of 1995.

sweet's unlawful refusal to recall them, so that twenty-seven of the original thirty-one employees might still have been present if not for the company's illegal acts. The Board chose to consider all twenty-seven as still present in calculating the degree of turnover, so that Intersweet would not benefit from its own illegal actions. Still, Intersweet posits that even twenty-seven amounts to only about 20% of the workforce in place when the order was imposed, a figure comparable to those observed in *Montgomery Ward* (80% turnover) and *Impact Industries* (87% turnover), where bargaining orders were not enforced. 904 F.2d at 1160, 847 F.2d at 383.

Despite the comparability of these figures, however, we see no abuse of discretion in this case. As already discussed, the management at Intersweet had not meaningfully changed since the company had fired all of its employees to defeat unionization. Although the workforce had expanded, such extreme measures would certainly be known to subsequent hires, and Intersweet has offered no reason to suggest that the new workers would not be affected by the earlier practices. The Board found relevant in this regard the fact that although it had expanded, the workforce had not changed in nature. It still consisted entirely of unskilled laborers performing tasks that required only minutes of training. The new employees would therefore have no reason to believe that they are any less expendable than their predecessors. The Board found this factor to override any concern that the current workers might be forced to accept representation by a union that they had not chosen, and noted that the workers would be able to exert their will by rejecting the union in the future. In light of the severity of Intersweet's actions and the continuity in management, we see no abuse of discretion in the Board's finding that the change in workforce did not make a bargaining order unnecessary.

## III. Backpay

As part of her recommended order, the ALJ also required that Intersweet provide backpay and reinstatement to the employees that it had fired because of their union affilia-

tion. Intersweet argued that the affected employees were not entitled to backpay because—it had just learned-they were in fact aliens without authorization to work in the United States. The Board responded to this argument in a footnote by stating that it would "leave to the compliance stage of these proceedings a determination as to backpay and reinstatement...." 321 NLRB at 1 n. 2. The Board indicated that it would, at that time, consider the issue in accordance with its ruling in *A.P.R.A. Fuel Oil Buyers Group, Inc.*, 320 NLRB 408, 1995 WL 803434 (1995). 321 NLRB at 1 n. 2. Intersweet argues that the Board should not follow *A.P.R.A.* because it is inconsistent with this court's opinion in *Del Rey Tortilleria, Inc. v. NLRB*, 976 F.2d 1115 (7th Cir.1992). Despite intimating that it might rely on *A.P.R.A.* in a future proceeding, however, the Board did not reach this issue. It did not decide whether the workers were properly documented, and it did not determine how that status might affect their eligibility for back pay. Indeed, the record does not at this point contain evidence that confirms Intersweet's assertion about the workers' status. The Board's prospective suggestion about an analysis that it may apply if ultimately faced with such evidence does not present an issue currently ripe for review by this court. Indeed, the issue may never materialize, as undocumented workers may never seek to claim their backpay in any event. Any opinion we might express at this time would be entirely advisory.

## IV.

The Board did not abuse its discretion in determining that the change in circumstances did not alleviate the need for a bargaining order. Intersweet discharged its entire workforce, rehired only those employees that it believed had not signed union cards, and then openly disclosed to returning employees that the terminations were related to union affiliation. It is difficult to imagine a more egregious attempt to defeat unionization. The management team responsible for these practices remained essentially intact, and there is no reason to believe that the workforce, although expanded, would not

continue to be chilled by the earlier actions. The Board considered each of Intersweet's arguments and rejected them in a well-reasoned opinion. We find no abuse of discretion, and the Board's petition for enforcement of its order is GRANTED.