**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GERIG'S DUMP TRUCKING, INC., Respondent.**

No. 96–4093.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 1997.

Decided Feb. 25, 1998.

Charles P. Donnelly, Jr., National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Aileen A. Armstrong, Vincent Falvo (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Roberto G. Chavarry, National Labor Relations Board, Indianapolis, IN, for Petitioner.

James H. Hanson (argued), Douglas C. Haney, David C. Milne, Scopelitis, Garvin, Light & Hanson, Indianapolis, IN, for Respondent.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

There is a fine line between threats and predictions. An Administrative Law Judge ("ALJ") found that Gerig's Dump Trucking ("Gerig's") crossed that line when it told its employees that it would sell the company's assets and shut down operations if its employees continued their unionization drive. The ALJ also found that Gerig's had unlawfully offered its employees additional medical benefits in an effort to stave off the unionization effort. The National Labor Relations Board ("the Board") agreed with the ALJ's assessment of Gerig's actions and issued a *Gissel* order requiring the company to bargain with the union upon request. We enforce the Board's decision and order.

### I.

Gerig's Dump Trucking, Inc. was incorporated in May 1994 for the purpose of acquiring the assets and work contracts of a separate company, Gerig's Trucking and Leasing, Inc. ("GTLI"). Although Gerig's hired all of GTLI's twenty-one drivers, it also informed them that, as a newly formed company, it could not offer the drivers any benefits right away. Shortly after commencing operations, however, Gerig's promised the drivers that they would receive the same benefits they had received from GTLI: a cafeteria fringe benefits plan, life insurance, a 401(k) retirement program, and unpaid medical and disability benefits.

The drivers wanted better benefits, particularly paid group health and disability insurance, and in mid-July the Chauffers, Teamsters and Helpers Local Union No. 414 began an organizational campaign at Gerig's. On July 25, Local 414 presented Richard Meyers, Gerig's general manager, with signed recognition cards from fifteen of the drivers and demanded that Gerig's recognize the union that evening. Gerig's president, Craig Yoder, informed the drivers that Gerig's would not recognize Local 414 without an election, and the next day nineteen of the drivers went on strike.

Yoder approached the picket line on July 26, the first day of the strike, and asked the picketers to designate three representatives to discuss matters with him. Yoder told the representatives that he could not afford a Teamsters contract or to let the trucks sit idle, and he warned them that if the drivers failed to return to work by four o'clock the next day, he would have to sell or lease the trucks and cease doing business. He stated that he could easily sell the trucks to another company affiliated with Gerig's, Bunsold Trucking, and that even if the drivers were hired by Bunsold they would lose their seniority.

One of the three employee representatives, Norman Munson, called Meyers that evening to ask if he could return to work. Meyers told him that he could return only if he brought all of the other drivers with him. The following morning, the drivers were back on the picket line. But Yoder's comments the day before had taken their toll on the drivers' resolve; all but two crossed the picket line before Yoder's four o'clock deadline. Yoder told the drivers that he would consider their demands, and he subsequently sent a letter inviting the drivers to meet to discuss "additional benefits being considered for you which include long term disability benefits and medical insurance."

On August 2, the day of the meeting, several drivers questioned Yoder outside the restaurant where the other drivers were waiting. Yoder told them that he wanted to announce new health and disability benefits to the drivers, but he could not because "the Union was still out there." At the meeting itself, Yoder informed the drivers that they had to take care of a "problem" before he could help them. The next day, some drivers began circulating a petition to withdraw from the union.

The union resumed its recognitional picketing, which continued until Gerig's filed a charge against the union on August 25 for exceeding the statutory 30–day limit. On August 31, Yoder had a conversation with one of Gerig's drivers, Gene Hunnicut, in which Yoder said that Gerig's would never accept a union and that he would shut down the company and sell or lease its assets if the drivers organized. He also told Hunnicut that he hoped the drivers realized that they were better off without the union. At a meeting that evening, Yoder told the assembled drivers that they would receive benefits, including paid medical insurance, starting the next day.

Local 414 filed unfair labor practice charges against Gerig's, and a hearing was held before an Administrative Law Judge in April 1995. The ALJ found that Gerig's had threatened employees with business closure and loss of employment if they did not abandon a protected strike; had told a striking employee that he could not return to work unless all employees abandoned the strike and returned to work; had told another employee that supporting the union was futile; and had promised (and delivered) additional insurance benefits to employees to discourage support for the union. Based on these acts, the ALJ concluded that Gerig's had violated Sections 8(a)(1), (3), and (5) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. §§ 158(a)(1), (3), & (5). The Board adopted the ALJ's decision and ordered Gerig's to cease and desist from its unlawful activities, to post a notice to its employees, and to bargain with Local 414 as the exclusive bargaining representative of its employees.

## II.

■ On appeal, Gerig's challenges the Board's characterization of various events: the July 26th conversation between Yoder and the three employee representatives; the July 26th telephone conversation between Meyers and Munson; the letter sent by Yoder inviting the drivers to meet to discuss additional benefits; Yoder's comments at the August 2nd meeting; and Yoder's conversation with Hunnicut on August 31. Gerig's argues that none of these interactions involved unlawful threats or inducements designed to dissuade the employees from organizing. Rather, Gerig's contends that management's comments were in each instance either completely innocuous or else merely predictions of the negative effects that the employees' strike and unionization drive would inevitably have on the fledgling company. The NLRA does not prohibit employers from making such predictions so long as they are based on objective facts and do not threaten retaliation. *NLRB v. Village IX*, 723 F.2d 1360, 1367–68 (7th Cir.1983).

■ An employer violates § 8(a) of the NLRA whenever the employer's actions have a reasonable tendency to interfere with or coerce employees in the exercise of their protected rights. *NLRB v. Q–1 Motor Express*, 25 F.3d 473, 477 (7th Cir.1994), *cert. denied*, 513 U.S. 1080, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). Interpretation of an employer's comments takes into account "the economic dependence of the employees on

their employers, and the necessary tendency of the former ... to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). The Board has the primary responsibility for determining whether statements constitute threats; we will uphold the Board's interpretations if they are supported by substantial evidence. *E & L Transport v. NLRB*, 85 F.3d 1258, 1273 (7th Cir.1996). We owe particular deference to the Board's findings regarding the credibility of witnesses, which we do not disturb absent extraordinary circumstances such as clear bias by the ALJ, utter disregard of uncontroverted sworn testimony, or acceptance of testimony that on its face is incredible. *Central Transp., Inc. v. NLRB*, 997 F.2d 1180, 1190 (7th Cir.1993).

■ Substantial evidence supports the Board's finding that Yoder unlawfully threatened the drivers in his July 26th conversation with the three employee representatives. Each of the representatives testified before the ALJ regarding this conversation. Gerig's points out that the drivers testified that, even before this conversation, they understood that their strike could have negative economic effects on the company. Yoder's comments, however, went beyond simply stating this objective fact. Yoder informed the representatives that he would sell the company's assets and that the drivers would lose their jobs or at least their seniority. According to the representatives, Yoder also told them that he would take a loss by leasing the trucks immediately to this competitor rather than bargain with the union. The ALJ credited this testimony, and Gerig's offers no reason for upsetting this credibility determination on appeal.

■ There is also substantial evidence supporting the Board's characterization of the July 26th telephone conversation between Meyers and Munson. In his direct testimony before the ALJ, Munson stated that Meyers told him that he could return only if he brought the other drivers with him. On cross examination, however, Munson stated that Meyers also said that he had no

control over whether Munson could return to work. Gerig's argues that this statement on cross examination demonstrates conclusively that Meyers did not condition Munson's return on the abandonment of the strike, and Gerig's complains that the ALJ only credited the first part of Munson's sworn testimony.

It is evident from the ALJ's decision, however, that the ALJ did credit both parts of Munson's testimony. The ALJ states that when Munson asked if he could return to work, "Meyers responded that he had no control over that and for Munson to return to work all the drivers had to return." Since an employee has a right under Section 7 of the Act to refrain from, as well as to engage in, activities protected under the NLRA, *see* 29 U.S.C. § 157, the message that Munson could return only if the drivers abandoned the strike interfered with the exercise of Munson's rights under the statute.

■ The Board also found a violation in the letter sent by Yoder inviting the drivers to attend the August 2nd meeting. The letter stated, in pertinent part:

As we discussed at our earlier meetings with you, we are now ready to implement the 401(k) retirement plan and the Section 125 cafeteria plan, as well as the $15,000 of life insurance coverage. We also wish to discuss at this meeting additional benefits being considered for you which include long term disability benefits and medical insurance.

The letter did not expressly condition the receipt of additional benefits on the drivers' abandonment of their unionization drive. The Board, however, considered the letter in the context of the events immediately surrounding it. The letter followed on the heels of the drivers' decision to stop picketing, and Gerig's explicitly offered new benefits—which the Board found to be conditional on the drivers' rejection of the union—at the August 2nd meeting only a few days later. In light of the letter's close relationship to these events, the Board interpreted the letter as making a conditional offer of benefits.

■ Gerig's complains that the Board punishes it twice for the same infraction in finding that both the letter and the statements at

the August 2nd meeting violated the Act. We agree with the Board that the two violations are distinct. Although the events at the meeting are part of the context supporting the Board's interpretation of the letter, this does not invalidate the Board's view of the letter as an independent violation. Events preceding Yoder's decision to send the letter (namely, the use of threats to convince the drivers to stop picketing) also informed the Board's interpretation. The Board's interpretation of the letter is supported by the evidence.

■ Gerig's also contests the Board's finding that it acted unlawfully at the August 2nd meeting. Gerig's argues that, although there was testimony that Yoder told the drivers that they had to take care of a "problem" before the company could offer them benefits, there was no testimony suggesting that the "problem" was the union. Again, though, the reference to the union may be inferred from the context. The Board's interpretation is reasonable and, given the testimony regarding Yoder's comments, it is supported by substantial evidence. Furthermore, we are not convinced by Gerig's contentions that Yoder was merely adhering to his legal obligation to refrain from offering new benefits during the unionization drive. Although Yoder attempted to characterize his comments this way, the ALJ did not find him to be a credible witness and instead interpreted his comments as a veiled promise of benefits in return for disavowal of the union. This is a plausible interpretation of events that is supported by substantial evidence, and we therefore affirm the Board's finding that Gerig's made an unlawful, conditional offer of benefits at the August 2nd meeting.

■ Finally, Gerig's challenges the Board's assessment of the events of August 31, which include the interaction between Yoder and Hunnicut as well as the announcement of new benefits, including paid medical insurance, to begin the following day. The ALJ heard testimony that Yoder announced to Hunnicut that Gerig's "would never be union" and that the drivers should realize that they were better off without the union. It is also undisputed that Gerig's extended paid medical benefits to the drivers on that same day. Gerig's argues that it cannot be liable for the events of August 31 because they occurred after the drivers' organizing campaign had ceased. This argument fails, however, in light of the Board's conclusion that Gerig's earlier unlawful behavior was the reason for the drivers' apparent abandonment of that campaign.

■ Gerig's also maintains that the Board's findings regarding the conversation with Hunnicut must be reversed because the Board's complaint is unsupported by the union's underlying unfair labor practice charge. *See Reebie Storage & Moving Co., Inc. v. NLRB*, 44 F.3d 605, 608–10 (7th Cir.1995). But Yoder's comments on August 31 merely echoed his statements to the picketers on July 26, which are described in the original charge filed on August 15. Although the Board "does not have carte blanche to expand the charge as it might please, or to ignore it altogether", the Board may allege an additional violation when "the newly alleged violation occurred within six months of the filing of the charge; and ... the newly alleged violation is 'closely related' to the violations alleged in the charge." *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 820 (7th Cir.1991) (citation omitted). *See also Reebie*, 44 F.3d at 608 (considering whether the new allegations are of the same class, or arise from the same factual situation, as those contained in the charge). The complaint is sufficiently related to the charge in this case.

■ We also disagree with Gerig's contention that its extension of paid medical insurance on August 31 was permissible because it had planned to offer these benefits even before the drivers started their unionization effort. There was no documentation or other evidence of such a plan beyond the self-serving statements of Yoder himself, which the ALJ discredited. The evidence that is available—Gerig's initial promise to provide the drivers with the same benefits that they had received at GTLI—contradicts this position. Thus, we conclude that the Board's findings regarding violations stemming from the events of August 31 are also supported by substantial evidence.

### III.

Gerig's contends that the Board abused its decision in issuing a *Gissel* order requiring it to bargain with the union. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In Gerig's view, the violations found by the Board are not pervasive enough to warrant such an order. This argument has no merit, for evaluation of the pervasiveness of a company's unfair labor practices seems particularly appropriate to leave to the discretion of the Board when, as here, there is substantial evidence of repeated violations of the NLRA. Gerig's also argues, however, that the Board failed to consider evidence of turnover in the company's personnel. According to Gerig's, only five members of the original bargaining unit remain in the company's employ. In addition, Meyers no longer works at the company, and Yoder is no longer involved in managing the firm. Gerig's asserts that in light of this turnover, the Board was wrong to assume that the employees continued to support the union and to assume that a fair and impartial union election was impossible.

We review the issuance of a *Gissel* order for an abuse of discretion. *NLRB v. Intersweet*, 125 F.3d 1064, 1067 (7th Cir. 1997). Although we require the Board "to adequately consider alternatives and explain its choice, we will not otherwise disturb the Board's decision unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.* at 1068 (quotation omitted). The Board did consider both of Gerig's arguments in issuing its order, and it explained its reasoning in rejecting them. Although some of the Board's reasoning is problematic, the alternative grounds offered by the Board for its decision are adequate, and we therefore conclude that the Board ultimately did not abuse its discretion in issuing its order.

In considering Gerig's argument that a *Gissel* order is inappropriate because of employee and management turnover, the Board stated that "turnover in the bargaining unit is irrelevant in assessing the propriety of a bargaining order because the validity of a bargaining order depends on an evalua-

tion of the situation as of the time the unfair labor practices were committed." (internal quotation omitted). This is true as far as the initial validity of the order is concerned, but when the Board petitions the court of appeals for enforcement of an order, employee and management turnover is relevant to the court's decision even when there is no doubt that the order was valid when issued. *See NLRB v. Thill*, 980 F.2d 1137, 1142 (7th Cir.1992). The Board did, however, proceed to address the level of turnover that had occurred by the date of its decision on March 25, 1996. The Board found that "[e]ven assuming that turnover were a relevant consideration, ... a majority of the employees who were in the bargaining unit on July 25 are still in the bargaining unit and ... they now comprise more than half of the present bargaining unit." Accordingly, the Board decided that a *Gissel* order was still appropriate despite the turnover that had occurred.

It is true that we have on several occasions declined to enforce a *Gissel* order because of turnover and a lapse of time between the date of the labor violations and the date of the petition to enforce the order. *See, e.g., Thill*, 980 F.2d at 1138 (lapse of over nine years); *Montgomery Ward & Co., Inc. v. NLRB*, 904 F.2d 1156, 1157 (7th Cir.1990) (lapse of eight years); *Impact Indus. Inc. v. NLRB*, 847 F.2d 379, 381 (7th Cir.1988) (lapse of seven-and-a-half years). Only three-and-a-half years have elapsed in this case; the violations occurred in the summer of 1994. In cases involving a lapse of three to four years, we have tended to enforce *Gissel* orders, for we "find[ ] the time period to be an 'ordinary institutional time lapse[ ] inherent in the legal process,' that was distinguishable from the longer periods found questionable in *Montgomery Ward* and *Thill*." *Intersweet*, 125 F.3d at 1068–69 (second alteration in original) (*quoting America's Best Quality Coatings Corp. v. NLRB*, 44 F.3d 516, 522 (7th Cir.), *cert. denied*, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995)).

Although not much time has elapsed in this case, Gerig's argues that the order was nevertheless an abuse of discretion because only five of the original drivers remain employees of the company. This gives us some pause,

but we do not believe that this fact alone should prevent enforcement of the Board's order. We have enforced *Gissel* orders even when only 20% of the original workforce is still in place. *See Intersweet*, 125 F.3d at 1070. Furthermore, although Gerig's asserts that Yoder no longer actively manages the company, there is no indication that ownership and control of the company has meaningfully changed. *See id.* at 1069 (enforcing *Gissel* order even though a key manager responsible for the firm's unfair labor practices had died). We have generally required significantly more than this to demonstrate that management has changed in a meaningful way. In *Impact Industries*, for example, we concluded that management had meaningfully changed because the original co-owners had both died and the company was currently being run by trustees. *See* 847 F.2d at 383. In *Montgomery Ward*, we reached the same conclusion because twelve out of thirteen of the managers who had perpetrated the unfair labor practices had left the company. *See* 904 F.2d at 1160. Gerig's does not offer evidence approaching the level of these other cases. We do not believe that the Board abused its discretion in issuing a *Gissel* order under the circumstances of the instant case.

For the reasons stated, we enforce the Board's decision and order.